[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1099 
This is an appeal by defendants McNally-Pittsburg Manufacturing Corporation (McNally) and Bill Surrency from a judgment based on a jury verdict in favor of plaintiff, Willis J. Harbison, and a denial of a motion for new trial or judgment notwithstanding the verdict. Harbison cross-appealed from the grant of a directed verdict against him on his outrageous conduct count. We reverse as to the defendants' appeal and remand for new trial on the assault and battery claim, and affirm as to plaintiff's cross-appeal.
In his complaint, Harbison alleged, among other causes of action, assault and battery, defamation, conspiracy, and outrageous conduct. The trial judge entered a directed verdict in favor of McNally and Surrency with respect to all allegations except one incident involving slanderous comments made during a grievance hearing and one incident involving an alleged assault and battery occurring inside a clarifier machine. These two occurrences were submitted to the jury for its consideration. Following the $120,000 verdict for the plaintiff, the trial judge entered an order stating that if plaintiff Harbison did not accept a remittitur of damages to $80,000 by April 26, 1985, then the defendants' motion for new trial or judgment notwithstanding the verdict would be granted. A remittitur to $80,000 was subsequently entered. Both plaintiff and defendants appeal.
From 1975 to 1979, McNally constructed a coal preparation plant for Jim Walter Resources at the Brookwood Mine facility near Tuscaloosa, Alabama. McNally had a collective bargaining agreement with the United Mine Workers of America (UMWA), Local 1867, which contained a provision stating that all disputes and claims arising under the agreement should be resolved through the grievance procedure set out in the agreement.
Harbison was employed by McNally in July 1975 as a painter on the Brookwood Mine project, and all apparently went well for Harbison until 1978.
In February 1978, Joe Bowman, the McNally project superintendent, asked Harbison, in his position as grievance committee chairman, to review a set of working rules sent by the company to determine whether the rules coincided with the contract. John Jeter, the McNally labor relations director, disagreed with the corrections and additions made by Harbison. At this time, according to Harbison, his relationship with Bowman began to deteriorate.
Shortly after the aforementioned incident, Bob Keller, a McNally foreman, stopped Harbison and put a copy of a warning slip into Harbison's shirt pocket. Harbison removed the slip from his pocket and tore it up.[1] The next day, Bowman called Harbison into his office and, according to Harbison, cursed him for destroying the warning slip. When Harbison started to leave the office, Bowman allegedly knocked his hand off the door, shoved Harbison against the wall, and said, "You're not going anywhere."
A few days later, James Watson, a McNally supervisor, confronted Harbison about his involvement in a work stoppage. Harbison told Watson that he had played no part in it. According to Harbison, during *Page 1100 
their discussion, Watson leaned on him and bumped him with his chest and stomach in a threatening manner.
On still another occasion about this same period of time (early to mid-1978), Bowman ordered Harbison to paint under a truss that was suspended by a crane. Harbison complained about the danger that the cable could break. Bowman allegedly said that if the truss fell on Harbison it would be the happiest day of his (Bowman's) life. The truss was put on blocks, in accord with usual procedure, before Harbison finally painted it.
In September 1978, Harbison and his brother, Earnest, were talking at the job site when Ron Parchman, another McNally employee, allegedly approached both and began cursing Earnest. Harbison asked Parchman to refrain from cursing Earnest, whereupon Parchman began cursing Harbison, who then turned to walk away. At this point, Bowman came up and warned Harbison and Parchman to cease their argument and to refrain from cursing each other.
The following day, Harbison says, he was drinking coffee when Parchman shoved him and caused him to spill coffee on another employee. In response to this shoving, Harbison filed a safety grievance with McNally, claiming that he was not being afforded a safe place to work, and he withdrew from the job.
Subsequently, a safety grievance hearing was held at the McNally office. Those in attendance included the UMWA safety inspector, a UMWA district representative, the president of the local UMWA, a safety committeeman, Bowman, Parchman, and Surrency (another McNally employee). The purpose of the meeting was to resolve the grievance filed by Harbison with respect to the shoving incident. Harbison's witnesses testified that, during the course of the grievance hearing, Bowman was responding to the reason for the problems involving Harbison and allegedly commented that he did not want Harbison on the job because Harbison was a homosexual and had "made a pass" at Surrency or Parchman. The witnesses contradicted each other in their statements as to whom Harbison had directed his attentions to. All of the witnesses for McNally and Surrency denied that these alleged comments were ever made.
Harbison continued to work as a painter for McNally until he, along with 70 other employees, was laid off pursuant to the collective bargaining agreement. Harbison went to work for Vulcan Painters (Vulcan) in December 1979. McNally had subcontracted all painting at the Brookwood mine to Vulcan, so Harbison was continuing to perform for Vulcan work similar to that which he had done for McNally.
Meanwhile, McNally had constructed a "clarifier," which was used to wash and separate coal after it was mined. Before the clarifier could be put into operation, the arms (or rakes) used to wash the coal had to be leveled, calibrated, and painted. The calibration involved movement of the arms by the operator at the control switch as well as measurements taken by two other employees, Olin Kelly and Charles Nix. The arms were not to be moved without an instruction given by John McDermick, a non-employee in charge of the calibration process, together with a warning shouted by Nix or Kelly to "stand clear." All witnesses testified that the arms moved very slowly. In fact, the rate of speed was established at 22 minutes per revolution. McNally and Surrency presented witnesses who testified that even if the arms hit a person he would not be hurt.
During the calibration process, Harbison claims, he was inside the machine painting when, without warning, the arms moved and one arm hit him on the back and the head. He said he looked up and saw Surrency sitting at the controls. Surrency had not operated the controls of the clarifier before. After he was struck, Harbison screamed at Surrency, who allegedly replied, "Withdraw you son of a bitch." Nix and Kelly heard Harbison yell, but testified that they did not know what happened. There is some dispute as to whether the arm actually moved. Harbison testified *Page 1101 
that, despite having been hit in the back and head, he was not hurt.
Additional importance was placed on the clarifier incident by Harbison, who offered evidence of two other incidents. First, Harbison offered testimony through a witness that management people at McNally had offered $15,000 to three people "to take care of" some troublemakers. This witness also testified that it was understood at the job site that Harbison was a troublemaker. In addition, one of Harbison's witnesses testified that on the morning before the clarifier incident he heard Bowman say, "We have to get the redhead son of a bitch off the job. Lay off, whatever you do, just get him off."
Numerous issues are raised in both sets of briefs; however, we find only the following issues to be controlling:
(1) Whether the trial court erred in refusing to grant defendants' motion in limine requesting that plaintiff be precluded from testifying that he was a minister.
(2) Whether the slander claim or the assault and battery claim is preempted under either the National Labor Relations Act or the collective bargaining agreement.
(3) Whether Harbison established the necessary elements of assault and battery.
(4) Whether the trial court erred in charging the jury on the requirement of proving willfulness and wantonness in order to recover punitive damages for assault and battery.
(5) Whether the trial court erred in entering a directed verdict in favor of the defendants on the plaintiff's claim of outrageous conduct.
 I. MOTION IN LIMINE
McNally and Surrency urge this Court to find that the trial court erred in refusing to grant their motion in limine requesting that Harbison be precluded from testifying that he was a minister. They argue that this testimony had nothing to do with his lawsuit and that this testimony could have prejudiced the jury against them.
Questions as to relevancy of testimony are ordinarily within the discretion of the trial court and its rulings will not be reversed on appeal unless its discretion has been grossly abused. See May v. Moore, 424 So.2d 596 (Ala. 1982) (motion in limine); Costarides v. Miller, 374 So.2d 1335 (Ala. 1979); andHarper v. Baptist Medical Center-Princeton, 341 So.2d 133 (Ala. 1976). We find no such abuse of discretion. In addition, we note that the testimony elicited from Harbison concerning his occupation was presented during the standard line of questioning concerning education and work experience. Accordingly, we find that the trial court did not err in denying defendants' motion in limine.
 II. PREEMPTION
Appellants McNally and Surrency argue, in effect, that all
disputes, including the claims for slander and assault and battery, are required to be settled through the grievance procedure under the collective bargaining agreement. Furthermore, they maintain that any alleged slanderous statements made are absolutely privileged or, at the very least, are qualifiedly privileged and actionable only upon a showing of actual malice. According to appellants, this view is necessary to encourage the uninhibited flow of communication and exchange of ideas in order to promote and preserve industrial peace.
Intentional tort claims, such as defamation and assault and battery actions, separate from the collective bargaining agreement, are not preempted from consideration in state court. In Republic Steel Corporation v. Maddox, 379 U.S. 650,85 S.Ct. 614, 13 L.Ed.2d 580 (1965), the United States Supreme Court held that a former employee was precluded from bringing a state court suit to recover severance pay allegedly owed him under the terms of a collective bargaining agreement because he did not first utilize the grievance procedures. The Court stated:
 "A contrary rule which would permit an individual employee to completely sidestep available grievance procedures *Page 1102 
in favor of a lawsuit has little to commend it. In addition to cutting across the interests already mentioned, it would deprive employer and union of the ability to establish a uniform and exclusive method for orderly settlement of employee grievances. If a grievance procedure cannot be made exclusive, it loses much of its desirability as a method of settlement. A rule creating such a situation `would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements.' Local 174, Teamsters v. Lucas-Flour Co., 369 U.S. 95, 103, 82 S.Ct. 571, 577, 7 L.Ed.2d 593." 379 U.S. at 653, 85 S.Ct. at 616.
The United States Supreme Court clearly did not intend such language to apply to all types of lawsuits, because the following year the Court held that the National Labor Relations Act did not bar maintenance of a libel action under state law by an employee seeking damages for defamatory statements published during a union organizing campaign. Linn v. UnitedPlant Guard Workers of America, Local 114, 383 U.S. 53,86 S.Ct. 657, 15 L.Ed.2d 582 (1966). The Court, however, explicitly limited "the availability of state remedies for libel to those instances in which the complainant can show that the defamatory statements were circulated with malice and caused him damage." 383 U.S. at 64-65.
In Allis-Chalmers Corp. v. Lueck, 471 U.S. 202,105 S.Ct. 1904, 85 L.Ed.2d 206 (1985), the Supreme Court, at first glance, appears to have resumed its seemingly comprehensive position set out in Republic Steel Corp., supra. In this most recent case, the Court held that an employee could not bring a state law tort action for bad faith in handling a claim against his employer and its insurer under the collective bargaining agreement. The distinction between that case and Linn, supra, was that in Lueck, the tort claim had its roots in the contract, while in Linn the tort claim was independent of any claim in contract. The Lueck bad faith claim was preempted because the extent of the duty to pay and the corresponding duty to act in good faith depended "upon the terms of the agreement of the parties" and "are tightly bound with questions of contract interpretation that must be left to federal law." 471 U.S. at ___, 105 S.Ct. at 1914. The Court explained:
 "[W]e [do not] hold that every state-law suit asserting a right that relates in some way to a provision in a collective-bargaining agreement, or more generally to the parties to such an agreement, necessarily is pre-empted by § 301. The full scope of the pre-emptive effect of federal labor-contract law remains to be fleshed out on a case-by-case basis. We do hold that when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim, see Avco Corp. v. Aero Lodge 735, 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968), or dismissed as preempted by federal labor-contract law. . . ." 471 U.S. at ___, 105 S.Ct. at 1916.
Since the plaintiff's slander and assault and battery claims are not bound with questions of the labor contract's interpretation, we hold that these intentional tort claims are not, per se, preempted from state court consideration.
Intertwined with the theory of preemption, however, is the theory of privilege. In Dunning v. Boyes, 351 So.2d 883 (Ala. 1977), cert. denied, 436 U.S. 917, 98 S.Ct. 2261,56 L.Ed.2d 757 (1978), a case dealing with an alleged defamatory statement made during a grievance hearing, we interpreted Linn to mean that state libel actions are preempted by federal labor laws to the extent that a plaintiff is prohibited from recovering damages for a defamatory statement made during the course of alabor dispute, unless "he can establish that the statement was made maliciously, with knowledge that it was false or with reckless disregard for whether it was false or not." 351 So.2d at 884. We explicitly rejected the theory of absolute privilege suggested in General Motors Corp. v. *Page 1103 Mendicki, 367 F.2d 66 (10th Cir. 1966). Some five years later, in Brooks v. Solomon Co., 542 F. Supp. 1229 (N.D.Ala. 1982), another case involving an alleged defamatory statement made during a grievance hearing, Judge Propst adopted the Mendicki
absolute-privilege line of cases, writing:
 "The second issue to address is: should the defense of absolute privilege be applied to statements made at such a proceeding [i.e., a grievance committee proceeding]?
 "Federal labor policy favors the peaceable resolution of labor grievances through conferences and bargaining processes. See Mendicki, supra, and Honaker [v. Florida Power Light Co., 95 L.R.R.M. (BNA) 3268 (M.D.Fla. 1977)]. Courts have clearly held that in light of this overriding policy to `encourage, facilitate and effectuate the settlement of issues between employers and employees' an unqualified and absolute privilege should be applied to alleged defamatory remarks made in the context of such a meeting. The plaintiff has urged the application of Linn. v. United Plant Guard Workers of America, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582
(1966), to the circumstances at hand in an attempt to convince the court to apply the Alabama common law of conditional privilege as set out in Dunning v. Boyes, 351 So.2d 883 (Ala. 1977), cert. denied, 436 U.S. 917, 98 S.Ct. 2261, 56 L.Ed.2d 757 (1978). The Linn
decision apparently opened the way for application of state law to certain defamatory conduct occurring in the context of labor relations. However, Linn's facts are distinguishable from the facts here. Linn dealt with a libel action for statements published during a union organizing campaign. In the instant action we have a libel action for statements made at a management-union grievance adjustment proceeding conducted pursuant to a collective bargaining agreement. As recognized in Mendicki, the question under circumstances such as those in this action is whether an action for damages on account of the statement of Allen Solomon made in a conference contemplated by the collective bargaining agreement for the adjustment of an employee's grievance would interfere with the national labor policy, and whether it is necessary to hold such statements unqualifiedly privileged to prevent impairment of that policy. In Linn the question was whether a libel action in the circumstances of that case `might interfere with the national labor policy.' The Linn decision involved written statements published in a union organizing campaign. In Linn exclusive jurisdiction was unsuccessfully sought on the basis of statements arguably made during the course of what the law forbids or discourages; an unfair labor practice. While the NLRB [National Labor Relations Board] has jurisdiction over claims of unfair labor practice, there is no federal policy reason to shield the alleged libeler from a libel made during the course of an unfair labor practice. Here the statements were made during a proceeding which, rather than being discouraged by federal law, is encouraged by federal law; federal policy being to encourage the peaceful disposition of grievance issues. While the libelous statements considered in Linn, and the context in which they were uttered, constituted conduct which was merely a `peripheral concern' of the NLRB, the circumstances giving rise to the action at bar involve interests which necessarily require the uniform employment of federal law in order to prevent the impairment of national labor policy." 542 F. Supp. at 1233-34. (Footnotes omitted.)
We find the view expressed in Brooks to be persuasive and reflective of the trend in this area of the law,[2] and to *Page 1104 
the extent that it is inconsistent with Dunning, supra, we hereby overrule Dunning. Therefore, the slander count should not have been submitted to the jury, since the slanderous comment alleged to have been made during the course of the grievance hearing, if made, was absolutely privileged. We have found no cases or rationale providing a privilege as to violence in the labor setting, so we specifically exempt the assault and battery claim from the purview of privileged matters.
 III. ELEMENTS OF ASSAULT AND BATTERY
McNally and Surrency argue that Harbison failed to establish the necessary elements of assault and battery, because he did not claim to have been physically injured and because he did not present proof that he was touched by Surrency in rudeness, in anger, or in a hostile manner. An actual injury to the body is not a necessary element of a civil assault and battery.Bennett v. State, 57 Ala. App. 568, 571, 329 So.2d 627 (1976). In Singer Sewing Machine Co. v. Methvin, 184 Ala. 554, 561,63 So. 997, 1000 (1913), this Court stated:
 "As to what acts will constitute a battery in a case like this, the rule is well stated by Mr. Cooley in his work on Torts. He says: `A successful assault becomes a battery. A battery consists in an injury actually done to the person of another in an angry or revengeful or rude or insolent manner, as by spitting in the face, or in any way touching him in anger, or violently jostling him out of the way, or in doing any intentional violence to the person of another. The wrong here consists, not in the touching, so much as in the manner or spirit in which it is done, and the question of bodily pain is important only as affecting the damages. Thus, to lay hands on another in a hostile manner is a battery, although no damage follows; but to touch another, merely to attract his attention, is no battery and not unlawful. And to push gently against one, in the endeavor to make way through a crowd, is no battery; but to do so rudely and insolently is and may justify damages proportioned to the rudeness. . . ." (Emphasis added.)
Furthermore, when there is conflicting evidence, as here, the issue of whether there was, in fact, an assault and battery at all is a question for the jury. See Britling Cafeteria Co. v.Shotts, 230 Ala. 597, 162 So. 378 (1935); Wilson v. Orr,210 Ala. 93, 97 So. 133 (1923); Singer, supra; 6A C.J.S. Assaultand Battery § 50 at 401 (1975).
 IV. PUNITIVE DAMAGES AND WILLFUL AND WANTON INSTRUCTIONS
The next issue is whether the trial court erred in giving a charge requested by Harbison concerning wantonness and willfullness, because Harbison did not plead or prove any allegations in this regard.[3] This argument is part and parcel of the argument that the trial court erred in giving the punitive damages charge for assault and battery in view of the fact that plaintiff failed to allege willfulness and wantonness in his complaint.
Alabama is a "notice pleading" state. Simpson v. Jones,460 So.2d 1282 (Ala. 1984). Therefore, even though Harbison's complaint was inartfully drawn, when he requested punitive damages in his complaint, he, in effect, put the defendants on notice that he was alleging that the acts complained of were committed willfully, wantonly, or intentionally. Just as it is a jury question as to whether an assault and *Page 1105 
battery in fact occurred, it is a jury question as to what defendants' intent consisted of. Furthermore, prior and subsequent acts may be considered for this purpose. SeeHolcombe v. Whitaker, 294 Ala. 430, 318 So.2d 289 (1975);Stinson v. Richardson, 239 Ala. 161, 194 So. 508 (1940); Riddlev. Brown, 20 Ala. 412 (1852).
Furthermore, Harbison may be entitled to recover punitive damages if he shows that he suffered at least nominal damage and that the acts complained of were committed with malice, willfulness, or wanton and reckless disregard of the rights of others. Gulf Atlantic Life Ins. Co. v. Barnes, 405 So.2d 916
(Ala. 1981). It is not necessary that a punitive damages award bear any particular relationship to actual damages, and such an award will not be reversed unless the amount is so excessive as to indicate prejudice or passion. U-Haul Co. of Alabama v.Long, 382 So.2d 545 (Ala. 1980).
 V. OUTRAGEOUS CONDUCT
On cross-appeal, Harbison argues that the trial court erred in granting a directed verdict in favor of the defendants on his claim of outrageous conduct.
The standard of review for a directed verdict has been stated often but perhaps was best explained in Caterpillar Tractor Co.v. Ford, 406 So.2d 854, 856 (Ala. 1981)
 "A directed verdict is proper only where there is a complete absence of proof on an issue material to the claim or where there are no disputed questions of fact on which reasonable people could differ. Deal v. Johnson, 362 So.2d 214 (Ala. 1978). In considering a motion for directed verdict, the court must apply Rule 50 (e), ARCP, under which `a question must go to the jury, if the evidence, or any reasonable inference arising therefrom, furnishes a mere gleam, glimmer, spark . . . or a scintilla in support of the theory of the complaint. . . .' Dixie Electric Company v. Maggio, 294 Ala. 411, 318 So.2d 274 (Ala. 1975).
 "In addition, the trial court must view the entire evidence, and all reasonable inferences which a jury might have drawn therefrom, in the light most favorable to the non-moving party. Alabama Power Company v. Taylor, 293 Ala. 484, 306 So.2d 236
(1975); Vintage Enterprises, Inc. v. Cash, 348 So.2d 476 (Ala. 1977). Also, this Court's function in reviewing a motion for a directed verdict is to review the tendencies of the evidence most favorably to the non-movant, regardless of a view we may have as to the weight of the evidence, and we must allow such reasonable inferences as the jury were free to draw, not inferences which we may think the more probable. Beloit Corp. v. Harrell, 339 So.2d 992
(Ala. 1976)."
See also Pate v. Sunset Funeral Home, 465 So.2d 347 (Ala. 1984), and Ritch v. Waldrop, 428 So.2d 1 (Ala. 1982).
In order to rise to the level of "outrageous conduct," conduct must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." American Road Service Co. v. Inmon, 394 So.2d 361
(Ala. 1980), citing Restatement (Second) of Torts, § 46, Comment (d) (1965). We have recognized that the plaintiff's burden is heavy in such cases. Garvin v. Shewbart, 442 So.2d 80
(Ala. 1983).
Harbison failed to carry his burden of proof. Viewing the evidence in the light most favorable to Harbison, we cannot perceive the scintilla of evidence in support of his outrageous conduct theory necessary to prevent the directed verdict. Numerous incidents occurred over approximately a two-year period indicating that Harbison was unpopular among management and among some of his own co-employees; however, the incidents were just that — incidents. They were
 "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. *Page 1106 
The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language and to occasional acts that are definitely inconsiderate and unkind."
Restatement (Second) of Torts, § 46, Comment (d) (1965).
Although the trial court was not in error in allowing the jury to consider the claim of assault and battery, the claim of slander should not have been submitted to the jury. Since the jury returned a general verdict, the judgment must be reversed and the cause remanded for a new trial. Aspinwall v. Gowens,405 So.2d 134 (Ala. 1981). The rule with regard to the general verdict is the same whether the appellant challenges the trial judge's failure to grant his motion for directed verdict or the trial judge's failure to grant his motion for judgment notwithstanding the verdict:
 "[I]f the defendant files a motion for directed verdict as to a count which is not supported by the evidence and the court denies such motion, a general jury verdict will not be presumed to have been returned on a count which is supported by the evidence. . . . We cannot presume that the general jury verdict relates to one of the counts which the evidence did support, where it is equally possible that it is based on the count which is unsupported by the evidence. . . ."
John Deere Industrial Equipment Co. v. Keller, 431 So.2d 1155,1157 (Ala. 1983). Quoted in D.H. Holmes Dept. Store v. Feil,472 So.2d 1001 (Ala. 1985), and National Security Fire Casualty Co. v. Vintson, 454 So.2d 942 (Ala. 1984).
84-857 REVERSED AND REMANDED.
84-900 AFFIRMED.
TORBERT, C.J., and MADDOX, JONES, ALMON, SHORES, ADAMS and HOUSTON, JJ., concur.
[1] The contents of the warning slip are not important to this case, because the slip did not contain complaints from management regarding Harbison, but, rather, it contained complaints about another McNally employee. Harbison received a copy of the warning slip concerning another employee because of his position as grievance committee chairman. He testified that he did not voluntarily accept the warning slip because the work rules were in arbitration to determine if warning slips could be issued at all. Management had agreed not to issue any more such slips until arbitration was completed.
[2] See eg., Kloch v. Ratcliffe, 221 Neb. 241, 375 N.W.2d 916
(1985); Sturdivant v. Seaboard Service System, Ltd.,459 A.2d 1058 (D.C.App. 1983) (arbitration proceedings); Hasten v.Phillips Petroleum Co., 640 F.2d 274 (10th Cir. 1981) (letter of dismissal pursuant to collective bargaining agreement);Turner v. Gateway Transportation Co., 569 S.W.2d 358 (Mo.App. 1978); Neece v. Kantu, 84 N.M. 700, 507 P.2d 447, cert. denied,84 N.M. 696, 507 P.2d 443 (1973); Joftes v. Kaufman,324 F. Supp. 660 (D.D.C. 1971) (letters of dismissal pursuant to collective bargaining agreement); and Corbin v. Washington Fireand Marine Ins. Co., 278 F. Supp. 393 (D.S.C. 1968) (arbitration proceedings).
[3] We are not concerned here with the jury charge as it relates to the slander count, since we have already held that the slander count should not have been submitted to the jury.