[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1087 
Jerry Nelson appeals from a summary judgment in favor of the defendants, Lapeyrouse Grain Corporation, George Brothers, Noah Jacobs, and P.J. Hanson, in a defamation action. We affirm in part, reverse in part, and remand.
Summary judgment is proper if there is no genuine issue of material fact as to any element of the affirmative defense of privilege or if there is no evidence tending to establish each element of defamation, and the moving party is entitled to a judgment as a matter of law. Rule 56 A.R.Civ.P. In determining whether summary judgment is proper, we must review the record in the light most favorable to plaintiff Nelson, the non-moving party, and resolve all reasonable doubts against the moving parties, the *Page 1088 
defendants. Webster v. Byrd, 494 So.2d 31 (Ala. 1986).
Lapeyrouse Grain Corporation ("Lapeyrouse"), which is engaged in the business of purchasing grain from farmers and then reselling it to processors or users, owns and operates a grain elevator in Mobile, Alabama. George Brothers is the president of Lapeyrouse. Noah Jacobs is an employee of Lapeyrouse and Nelson's immediate supervisor. Hanson is also an employee of Lapeyrouse. Nelson was employed by Lapeyrouse as a weigher. A weigher is responsible for weighing and unloading incoming trucks containing grain and recording the weight on a ticket.
A purchase transaction between a seller and Lapeyrouse, as the buyer, follows a regular pattern. First, the seller hauls his grain by truck to Lapeyrouse's grain elevator. Second, the weigher determines the weight of the grain by subtracting the tare weight of the truck from its gross weight. The weigher calculates the gross weight by driving the seller's truck containing grain onto a platform with scales and recording its weight on a ticket. Next, the weigher unloads the truck and weighs it a second time. The weight of the empty truck is the tare weight. The weigher records the tare weight on the ticket and calculates the difference between the gross weight and the tare weight. Third, the seller presents the ticket, which constitutes a bill of sale, to Lapeyrouse for payment.
In 1982, while performing an inventory check, Lapeyrouse discovered that the quantity of grain it had stored in its grain elevator was substantially less than the quantity of grain its records indicated that it had purchased. To ascertain the cause of the shortage, Lapeyrouse conducted an investigation. On several consecutive nights when Nelson was the weigher on duty, two Lapeyrouse employees, Jacobs and Hanson, "staked out" the grain elevator. Jacobs and Hanson observed Nelson allowing sellers to drive their loaded trucks over Lapeyrouse's scales without dumping their grain and then filling out tickets with fabricated weights as if grain had been dumped. After Lapeyrouse completed its surveillance of the grain elevator, it confronted employees it suspected of complicity in the theft scheme. On December 10, 1982, Brothers and B.C. Hall, a vice president of Lapeyrouse, met with Nelson at Lapeyrouse's office, in the presence of a polygraph test operator, to discuss the issue of the stolen grain. During the meeting, Brothers accused Nelson of stealing the grain. Nelson denied the accusation. Later that day, Brothers discharged Nelson. Brothers also met with John Taylor, a Lapeyrouse employee who unloaded grain. Taylor stated in an affidavit that, one week prior to Nelson's discharge, in the presence of a polygraph test operator, Brothers asked him if he "knew anything about Jerry stealing grain." Taylor replied by stating that he did not "see how Jerry could be stealing grain." At that point, according to Taylor, Brothers informed him that Nelson had been caught stealing grain.
Subsequent to his discharge, Nelson filed a grievance against Lapeyrouse pursuant to a collective bargaining agreement ("the agreement") between his union (the International Organization of Masters, Mates and Pilots (IOMM P)), and Lapeyrouse. The agreement, in pertinent part, provides:
"RECOGNITION
 "Section 1. The Company recognizes the IOMM P as the exclusive collective bargaining representative of its laborers, weighers, and clerks employed at its grain elevator at Blakely Island, Mobile, Alabama, excluding guards and supervisors, all as certified by the National Labor Relations Board on May 5, 1980, in Case No. 15-RC-6628.
 "Section 2. The specific terms of this Agreement shall be the sole source of any rights that may be exerted by the IOMM P or the employees against the Company.
"MANAGEMENT FUNCTIONS
 "Section 1. Except as expressly limited by a specific provision of this Agreement, the Company exclusively has and retains and the IOMM P recognizes the sole and exclusive right of the Company *Page 1089 
to exercise all the necessary and traditional rights and functions of management including, but not limited to, the following rights: * * * to suspend, discipline, discharge or otherwise discipline employees for just cause * * *.
"DISCIPLINE AND DISCHARGE
 "Section 1. The Company will not discipline or discharge any regular employee without just cause.
 "Section 2. Should there be any dispute between the Company and the Union or the employees concerning an alleged lack of just cause for a certain disciplinary action or discharge, such dispute shall be adjusted as a grievance in accordance with the terms of this Agreement. In all cases the burden of proof shall be a preponderance of the evidence, and the arbitrator shall determine which party bears the burden of proof."
At the hearing, the arbitrator heard testimony from several witnesses, including Brothers, Jacobs, and Hanson. Jacobs and Hanson testified as to what they had observed during the stakeout, which had the effect of implicating Nelson. After hearing all the evidence and after considering the arguments propounded by the union and by Lapeyrouse, the arbitrator rendered an opinion in which he held that Lapeyrouse had just cause to terminate Nelson. The arbitrator predicated his decision on evidence that tended to show that, at least on one occasion, November 8, Nelson took part in perpetrating a theft against Lapeyrouse. Specifically, the arbitrator determined that Lapeyrouse had proven by a preponderance of the evidence that on the night of November 8, 1982, Nelson was in charge of weighing and unloading trucks at Lapeyrouse's grain elevator and that a truck containing grain entered the elevator to be weighed and unloaded but, instead, left loaded and that, with Nelson's knowledge and supervision, a weight ticket was recorded with a false weight and presented to Lapeyrouse for payment.
On September 14, 1983, Nelson brought an action for slander against the defendants, seeking compensatory and punitive damages. Nelson alleged in his complaint and now argues on appeal that the following oral statements constituted slander: 1) Brothers's accusation that he committed a theft, in the presence of B.C. Hall and the polygraph test operator; 2) statements made during the grievance hearing; 3) Brothers's statement to John Taylor, a co-employee of Nelson, in the presence of a polygraph test operator, one week prior to his termination, that "Nelson had been caught stealing grain"; and 4) Jacobs's statement to Leo Bolar, a customer of Lapeyrouse, that "Jerry will not be with us long because Jerry was stealing grain."
The defendants filed an answer in which they set forth the defenses of privilege, truth, federal preemption, and an absence of publication. After several depositions had been taken and after affidavits had been filed, the trial court granted the defendants' motion for summary judgment, and Nelson appeals.
 I. Federal Preemption
The defendants argue that Nelson's slander claim is preempted by federal labor law. We disagree. In view of the United States Supreme Court's most recent pronouncement on the preemptive scope of § 301 of the Labor Management Relations Act[1] in Lingle v. Norge Division of MagicChef, Inc., ___ U.S. ___, 108 S.Ct. 1877,100 L.Ed.2d 410 (1988), we hold that Nelson's defamation claim is independent of the agreement and is thus actionable under state law. The United States Supreme Court vacatedReynolds Metals Co. v. Mays, 516 So.2d 517 (Ala. 1987), and remanded that case for reconsideration in light ofLingle. Therefore, Reynolds does not stand as a precedent for this case. *Page 1090 
In Lingle, an employer discharged an employee for filing a false worker's compensation claim. Rather than seeking redress under a collective bargaining agreement that provided employees with a contractual remedy for discharge without just cause, the employee instituted a state tort action for retaliatory discharge against her employer. The Court of Appeals found the state tort remedy to be preempted by § 301.
In reversing this decision, the Court stated:
 " '[T]o show retaliatory discharge, the plaintiff must set forth sufficient facts from which it can be inferred that (1) he was discharged or threatened with discharge and (2) the employer's motive in discharging or threatening to discharge him was to deter him from exercising his rights under the Act or to interfere with his exercise of those rights.' Horton v. Miller Chemical Co., 776 F.2d 1351, 1356 (CA7 1985) (summarizing Illinois state court decisions), cert. denied, 475 U.S. 1122, 106 S.Ct. 1641, 90 L.Ed.2d 186
(1986); see Gonzalez v. Prestress Engineering Corp., 115 Ill.2d 1, 104 Ill.Dec. 751, 503 N.E.2d 308 (1986). Each of these purely factual questions pertains to the conduct of the employee and the conduct and motivation of the employer. Neither of the elements requires a court to interpret any term of a collective-bargaining agreement. To defend against a retaliatory discharge claim, an employer must show that it had a nonretaliatory reason for the discharge, cf. Loyola University of Chicago v. Illinois Human Rights Comm'n, 149 Ill. App.3d 8, 102 Ill.Dec. 746, 500 N.E.2d 639 (1986); this purely factual inquiry likewise does not turn on the meaning of any provision of a collective-bargaining agreement. Thus, the state-law remedy in this case is 'independent' of the collective-bargaining agreement in the sense of 'independent' that matters for § 301 preemption purposes: resolution of the state-law claim does not require construing the collective-bargaining agreement.
". . . .
 ". . . [E]ven if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes."
Id., ___ U.S. at ___, 108 S.Ct. at 1882-83. Applying this standard to the case sub judice, we find that the plaintiff's state-law remedy is "independent" of the collective bargaining agreement for purposes of § 301 preemption. The legal questions underpinning Nelson's claim and the defendants' defenses would not require an interpretation of the labor agreement. Each element of Nelson's prima facie case or of the defendants' defenses can be resolved without recourse to the labor agreement. For instance, determining the existence of a privilege, a publication, or a defamatory statement — all essential questions implicated in defamation cases — does not inescapably lead to an analysis of the provisions of the labor agreement. Determining whether the defendants were protected by a conditional or absolute privilege does not depend on their contractual right to fire for "just cause" but instead on the occasion at which the allegedly defamatory communications were made or on the existence of a mutuality of interests or duties (see discussion of privilege, infra).
The United States Supreme Court's decision inAllis-Chalmers Corp. v. Lueck, 471 U.S. 202,105 S.Ct. 1904, 85 L.Ed.2d 206 (1985), which the Lingle
Court reaffirmed but explained, provides us with a clear guideline in resolving when § 301 preempts state tort actions. The controversy in Lueck arose from an employer's alleged bad faith handling of an employee's insurance claim. In evaluating the state-law action of the tort of bad faith in relation to the collective bargaining agreement, the Court concluded that whether an employee's right to receive disability benefits implicitly *Page 1091 
obligates an employer to act in good faith in extending those benefits involves a question of federal contract interpretation. In other words, because the duty under tort analysis stems by implication from the express terms of the contract, determining a breach of the duty depends upon the terms of the contract and, therefore, implicates federal labor law.
The tort of defamation, however, unlike the tort of bad faith, is not derivative of a contract action; it is not rooted in the agreement. Resolving an element of Nelson's defamation claim does not turn on "the terms of the agreement of the parties"; therefore, he has not presented a claim that is "tightly bound with questions of contract interpretation that must be left to federal law." Allis-Chalmers,471 U.S. at 216, 105 S.Ct. at 1913; Surrency v.Harbison, 489 So.2d 1097 (Ala. 1986).
 II. Slander per se
Nelson argues that the defendants' communications concerning his alleged theft of grain owned by Lapeyrouse were slanderous per se.
To establish a prima facie case of defamation, the plaintiff must show that the defendant was at least negligent,[2] see Mead Corp. v. Hicks,448 So.2d 308 (Ala. 1983); Restatement (Second) of Torts § 558, § 580B (1977), in publishing a false and defamatory statement to another concerning the plaintiff,Restatement (Second) of Torts § 558, which is either actionable without having to prove special harm (actionable per se) or actionable upon allegations and proof of special harm (actionable per quod). Restatement(Second) of Torts § 558; see also Albert Miller Co. v. Corte, 107 F.2d 432 (5th Cir. 1939), cert. denied, Corte v. Albert Miller Co., 309 U.S. 688,60 S.Ct. 890, 84 L.Ed. 1031 (1940). Spoken words that impute to the person of whom they are spoken the commission of an indictable criminal offense involving infamy or moral turpitude constitute slander actionable per se. Ceravolov. Brown, 364 So.2d 1155 (Ala. 1978), quoting Marionv. Davis, 217 Ala. 16, 114 So. 357 (1927); Tonsmeirev. Tonsmeire, 281 Ala. 102, 199 So.2d 645 (1967), quoting Marion v. Davis, 217 Ala. 16, 114 So. 357
(1927); Lewis v. Ritch, 417 So.2d 210
(Ala.Civ.App. 1982); Ala. Code 1975, § 6-5-180.[3] An oral publication *Page 1092 
imputing a crime of larceny falls within this definition.Phillips v. Bradshaw, 167 Ala. 199, 52 So. 662
(1910); Lewis, supra, at 211-12. When a defamatory publication is actionable per se, the law infers injury to reputation as a natural consequence of the defamation and, as a result, the plaintiff is entitled to presumed damages. Thus, imputations of indictable criminal offenses are slanderous per se and relieve the plaintiff of the requirement of proving "actual harm to reputation or any other damage" in order to recover nominal or compensatory damages. W. Prosser and W. Keeton, The Law of Torts, § 112, at 788 (5th ed. 1984). Of course, in such cases, the plaintiff's entitlement to presumed damages depends on whether he or she proves the remaining elements of defamation, and on whether the defendant alleges and shows the existence of an affirmative defense, such as truth or privilege. Defendants argue that the defenses of absolute and conditional privilege apply to their alleged slanderous comments. In libel and slander actions, a showing that the alleged defamation was made "on a privileged occasion or under circumstances and conditions which made it privileged in law" constitutes a complete defense. Ferdon v.Dickens, 161 Ala. 181, 49 So. 888 (1909).
 III. Absolute Privilege
In Surrency v. Harbison, 489 So.2d 1097 (Ala. 1986), we expanded the scope of the absolute privilege defense to include within its protective parameters allegedly defamatory statements made during federally recognized labor grievance hearings. In Surrency, the plaintiff filed a grievance with his employer pursuant to a collective bargaining agreement, which contained a provision establishing a procedure for the arbitration of disputes, claiming that he had been deprived of a safe workplace. During the course of the grievance hearing, a witness accused the plaintiff of homosexuality. Subsequently, the plaintiff brought, inter alia, a slander action against his employer, and at trial the jury returned a verdict in his favor. On appeal, relying on Brooks v. Solomon Co.,542 F. Supp. 1229 (N.D.Ala. 1982), in which the Court stated that the overriding federal labor policy of encouraging the resolution of labor disputes through collective bargaining procedures mandates the application of an absolute privilege defense to statements made during grievance hearings, we held that the slander count should not have been submitted to the jury, due to the defendants' entitlement to an absolute privilege for their slanderous remarks made during the grievance hearing. Thus, under the authority ofSurrency, supra, we hold that the defendants are entitled to an absolute privilege for their alleged slanderous statements made during the grievance hearing. Accordingly, summary judgment in their favor as to Nelson's claim based on those statements was proper.
Because Hanson's liability depends solely on whether his testimony during the grievance hearing defamed Nelson, our holding that the defense of absolute privilege applies to his testimony absolves him from any personal liability and, in turn, absolves Lapeyrouse from any vicarious liability for his testimony.
We now direct our attention to the remaining defendants, Brothers and Jacobs, and Lapeyrouse, as their principal. To ascertain the propriety of summary judgment as to these defendants on Nelson's claim based on Brothers's and Jacobs's alleged slanderous communications made outside the grievance hearing, we must first determine whether the communications satisfied the publication rule and, second, if they did, whether Brothers and Jacobs were conditionally privileged to make such communications.
 IV. Publication
Nelson predicates his claim against Brothers on two alleged defamatory communications *Page 1093 
that were made during the course of the theft investigation: 1) Brothers's accusation to Nelson, "I know that you have been taking grain," made during a meeting at which Hall and a polygraph test operator were present, and 2) Brothers's statement to John Taylor, a grain unloader for Lapeyrouse, in the presence of a polygraph test operator, that "they had caught Jerry Nelson stealing grain." Nelson's claim against Jacobs emanates from a discussion that occurred between Leo Bolar, a customer of Lapeyrouse, and Jacobs, Nelson's supervisor at the grain elevator. Bolar stated in an affidavit that two weeks prior to Nelson's termination in December 1982, Jacobs told him, outside Jacobs's office, that "Jerry will not be with us long because Jerry was stealing grain." According to Bolar, Jacobs also told him that the people in the office at Lapeyrouse had been accusing Jerry of stealing grain. When Bolar asked Jacobs "how could Jerry steal grain?" Jacobs replied, "I don't know."
To sustain an action for slander, plaintiff must show that the "alleged defamatory matter was published," § 6-5-182, Ala. Code 1975, "by proof of communication of the defamatory matter to someone other than himself." K-Mart Corp. v.Pendergrass, 494 So.2d 600 (Ala. 1986). In other words, there must be a communication of a defamatory matter to a third person. Prosser, at 767. In K-Mart, an employee successfully sued her employer, K-Mart, for defamation. On appeal, one of the primary issues was whether communications between K-Mart employees concerning the plaintiff-employee's alleged misappropriation of corporate funds constituted a defamatory publication. This Court, quoting Dixon v. Economy Co., 477 So.2d 353 (Ala. 1985), stated:
 " 'Communications among the managerial personnel of a corporation about the company's business do not constitute a publication, under the rule of McDaniel v. Crescent Motors, Inc., 249 Ala. 330, 31 So.2d 343 (1947).' "
K-Mart, at 603. Finding that the defamatory communication was made between managerial employees and concerned corporate business, we held that the communication was not a publication and thus reversed the plaintiff's judgment. See, also, Burney v. Southern Ry.,276 Ala. 637, 642, 165 So.2d 726, 730-31 (1964), in which this Court stated:
 "[W]here the letter is dictated by a corporate employee to a fellow corporate employee in the course of transacting the corporation's business and in the line of their duty as employees of the corporation and the letter is sent to another fellow corporate employee and it is in respect to that employee's relations with the corporation, there is not sufficient publication to sustain an action for libel."
Applying the McDaniel/Burney rule to the instant case, we hold that Lapeyrouse is not vicariously liable for Brothers's alleged defamatory communications to other corporate employees during the course of the theft investigation. Since Lapeyrouse is in the business of buying and selling grain, it follows that investigating shortages of grain concerns corporate business. Because Brothers's communications were necessary in determining the culpability of Nelson and other employees, they concerned corporate business and fell within the McDaniel/Burney "no publication" rule. The fact that Brothers communicated Nelson's involvement in the theft scheme to a non-managerial employee, Taylor, is irrelevant for purposes of determining Lapeyrouse's liability. As long as a communication to a non-managerial employee falls within the proper scope of that employee's knowledge or duties, the McDaniel/Burney
rule applies to non-managerial employees as well as to managerial employees. A corporation can act only through its servants, agents, or employees, Home Indem. Co. v.Anders, 459 So.2d 836 (Ala. 1984), and when officers and employees of a corporation act within the scope of their employment and within the line of their duties, they are not third persons vis-á-vis the corporation.
 " '[Officers and employees] are a part and parcel of the corporation itself, so much so, indeed, that their acts within the limits of their employment are the *Page 1094 
acts of the corporation. For a corporation, therefore, acting through one of its agents or representatives, to send a libelous communication to another of its agents or representatives, cannot be a publication of the libel on the part of the corporation. It is but communicating with itself.' "
Burney, 276 Ala. at 640-41, 165 So.2d at 729
(quoting Prins v. Holland-North America MortgageCo., 107 Wn. 206, 181 P. 680 (1919)).
Taylor worked with Nelson at the grain elevator, and it is reasonable to conclude that he might have had important information to disclose to Brothers as to the cause of the grain shortage. By taking part in the investigation, Taylor acted within the scope of his employment and within the line of his duties as a Lapeyrouse employee. Likewise, Brothers and Hall acted within the scope of their employment and within the line of their duties as corporate officers investigating a theft. Thus, Brothers's alleged defamatory communications to Hall and Taylor were not communications to third persons but to agents of Lapeyrouse and, therefore, were not publications. Lapeyrouse cannot be held liable solely on the basis of its alleged defamatory communications to itself.
However, Brothers's communications in the presence of a polygraph test operator and Jacobs's communications to Bolar do not fall within the McDaniel/Burney Rule. Neither the polygraph test operator nor Bolar is a Lapeyrouse employee. For this reason, it cannot be maintained that Brothers and Jacobs did not communicate an alleged defamatory statement to a third party. In these two instances, the publication requirement was satisfied.
 V. Conditional Privilege
Even if Brothers and Jacobs published a defamatory matter to, or in the presence of, a third person, summary judgment for them is proper if they were conditionally privileged to make such communications and if there is no evidence of actual malice. In Webster v. Byrd, 494 So.2d 31
(Ala. 1986), we stated that "[w]hether a communication is privileged by reason of its character or the occasion on which it was made is a question of law for the judge." The test for determining whether a conditional privilege exists is as follows:
 " ' " 'Where a party makes a communication, and such communication is prompted by duty owed either to the public or to a third party, or the communication is one in which the party has an interest, and it is made to another having a corresponding interest, the communication is privileged, if made in good faith and without actual malice. * * * The duty under which the party is privileged to make the communication need not be one having the force of legal obligation, but it is sufficient if it is social or moral in its nature and defendant in good faith believes he is acting in pursuance thereof, although in fact he is mistaken.' " "Willis v. Demopolis Nursing Home, Inc., 336 So.2d 1117, 1120 (Ala. 1976), quoting from Berry v. City of New York Insurance Co., 210 Ala. 369, 371, 98 So. 290, 292 (1923)."
Id. at 36.
In Montgomery v. Big B, Inc., 460 So.2d 1286 (Ala. 1984), the Court found that an allegedly defamatory communication made by corporate employees to a polygraph test operator concerning the plaintiff's alleged complicity in a misappropriation of corporate funds fell within this definition. Due to a mutual interest in the theft investigation, Brothers was also conditionally privileged to disclose an employee's criminal conduct in the presence of a polygraph test operator. As president of Lapeyrouse, Brothers naturally had a strong interest in determining who among his employees bore the responsibility for the grain shortage. The polygraph test operator had a corresponding interest in receiving pertinent information concerning the theft — and, specifically the impugning reasons for Nelson's discharge — in order to administer the test competently. This common interest afforded Brothers a privilege to communicate *Page 1095 
to the polygraph test operator Nelson's possible culpability. Such a privilege is lost only if the privileged declarant makes the communication in bad faith and with actual malice. The plaintiff bears the burden of proving common law actual malice by adducing
 "evidence of 'previous ill will, hostility, threats, rivalry, other actions, former libels or slanders, and the like . . . or . . . violence of the defendant's language, [and] the mode and extent of publication, and the like.' Kenney v. Gurley, 208 Ala. 623, 626, 95 So. 34, 37
(1923)."
Webster, supra, at 36.
Although "the determination of malice in defamation cases is particularly within the province of the jury,"Cousins, supra, at 906, in the instant case, Nelson failed to introduce any evidence that would tend to show that Brothers made the alleged defamatory communications with actual malice. Due to this evidentiary deficiency, the trial court correctly granted summary judgment in favor of Brothers and Lapeyrouse as to Nelson's claim based on Brothers's alleged defamatory communication made in the presence of the polygraph test operator. See Dent v. Smith,414 So.2d 77 (Ala. 1982); Big B, supra, at 1288.
Conversely, due to an absence of mutuality of interest, Jacobs did not hold a conditional privilege to explain to Bolar, a Lapeyrouse customer who had done business with Nelson, the reason for Nelson's discharge. Jacobs made the alleged defamatory statement outside the scope of the theft investigation. The record is devoid of any evidence suggesting that Jacobs had a legitimate interest in making such a communication or had a duty to do so. Similarly, Bolar had no legitimate reason for receiving this information. The record is devoid of any evidence showing that Bolar had a pecuniary interest at risk or that he was entitled to know because of some legal, social, or moral interest or duty. In short, we conclude that Jacobs did not publish the alleged defamation to Bolar pursuant to a common interest or duty that would have rendered it conditionally privileged. For this reason, and because we find some evidence of each element of defamation, summary judgment was inappropriate as to Jacobs. We further note that, because Jacobs's communication to Bolar that Nelson was "stealing grain" constitutes slander per se, Nelson will be entitled to presumed damages if he proves the remaining elements of aprima facie case of defamation.
We reach the same conclusion as to Lapeyrouse. We have held that "a corporation may be held liable for a slanderous utterance made by one of its agents if the slanderous utterance was made within the line and scope of the agent's employment." Cooper v. Alabama Farm Bureau MutualCasualty Insurance Co., 385 So.2d 630 (Ala. 1980). We have also held that "agency is normally a question of fact to be determined by the jury." Lawler Mobile Homes, Inc. v.Tarver, 492 So.2d 297 (Ala. 1986); Cooper Co., v.Bryant, 440 So.2d 1016 (Ala. 1983). Therefore, Lapeyrouse's liability for Jacobs's alleged defamatory communication presents a jury question.
In his complaint, Nelson seeks compensatory and punitive damages. To recover punitive damages in defamation cases, a plaintiff must show that the declarant communicated the defamatory statement with malice. In Dun Bradstreet, supra, the United States Supreme Court held that a plaintiff in a defamation case that does not involve matters of public concern can recover presumed and punitive damages without showing Sullivan actual malice.472 U.S. at 761, 105 S.Ct. at 2946. In view of Dun Bradstreet, the standard of proof that must be employed when determining malice depends on whether the defamatory communication involved matters of public concern. A "defamed" plaintiff who is a public official or a public figure or whose case involves matters of public concern must prove, by clear and convincing evidence, that the defamatory communication was made with Sullivan actual malice — that is, "with knowledge that it was false or with reckless disregard of whether it was false or not." Whitev. Mobile Press Register, Inc., 514 So.2d 902 (Ala. 1987); New York Times Co. v. Sullivan, 376 U.S. 254,84 S.Ct. 710, 11 L.Ed.2d 686 (1964). In such cases, the First *Page 1096 
Amendment interest in protecting this type of expression outweighs the countervailing State interest in protecting individuals from damage to reputation. Dun Bradstreet, supra. However, in defamation cases of purely private concern, like the instant case, the plaintiff must prove that the defamatory communication was uttered with common law actual malice as defined in Webster, supra, Cousins, supra, and Mead, supra. The scintilla rule of evidence applies in ascertaining the sufficiency of a plaintiff's evidence introduced to show common law actual malice. See Cousins, supra. When defamatory speech does not involve matters of public concern, the State interest outweighs the First Amendment interest. Allowing recovery of presumed and punitive damages on a less stringent evidentiary showing furthers the strong State interest in providing a remedy for defamation plaintiffs.Dun Bradstreet, at 760-61, 105 S.Ct. at 2946.
For the foregoing reasons, the summary judgment is affirmed as to Brothers and Hanson but reversed as to Jacobs and Lapeyrouse, and this cause is remanded for further proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
TORBERT, C.J., and MADDOX, JONES, ALMON, SHORES, BEATTY, ADAMS and STEAGALL, JJ., concur.
[1] Section 301 of the Labor Management Relations Act (LMRA) states:
 "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties. . . ." 29 U.S.C. § 185(a).
[2] Adhering to Gertz v. Robert Welch, Inc.,418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), which abrogated the common-law rule of strict liability in defamation cases, this Court adopted a negligence standard and held that "defendants who made false defamatory statements about private figures may be held liable if their conduct created an unreasonable risk of harm to the plaintiff." Mead Corp. v. Hicks, 448 So.2d 308, 312
(Ala. 1983). However, in view of the Dun Bradstreet holding (discussed infra, note 3), which was premised on the reduced constitutional value of speech involving no matters of public concern, it is questionable whether the fault requirement mandated by Gertz
survives. Comment, 37 Hastings L.J. 1171, 1193 (1986); Note, 75 Geo.L.J. 315 at note 35 (1986).
[3] Any doubts as to the constitutionality of §6-5-180, concerning its application to defamation cases involving private plaintiffs and matters not of public concern, raised by Gertz v. Robert Welch, Inc.,418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), were laid to rest in Dun Bradstreet, Inc. v. Greenmoss Builders,Inc., 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593
(1985). See Cousins v. T.G. Y. Stores Co.,514 So.2d 904 note 3 (Ala. 1987). The Gertz court held,inter alia, that "states may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth." Gertz, supra, 418 U.S. at p. 349, 94 S.Ct. at p. 3011. Eleven years later in Dun Bradstreet, supra, however, the Supreme Court narrowed the application of the Gertz rule by holding that a private defamation plaintiff can, without violating the First Amendment, recover presumed and punitive damages absent a showing of Sullivan actual malice when the defamatory statement does not involve matters of public concern. Dun Bradstreet, supra, 472 U.S. at 763,105 S.Ct. at 2947. Any language in the following cases inconsistent with Dun Bradstreet, is hereby disapproved:
Cousins, supra; Beneficial Management Corp. ofAmerica v. Evans, 421 So.2d 92 (Ala. 1982); Gray v.WALA-TV, 384 So.2d 1062 (Ala. 1980); Fulton v.Advertiser Co., 388 So.2d 533 (Ala. 1980), cert. denied,Bronner v. Fulton, 449 U.S. 1125, 101 S.Ct. 942,67 L.Ed.2d 111 (1981) and Advertiser Co. v. Fulton,449 U.S. 1131, 101 S.Ct. 954, 67 L.Ed.2d 119 (1981); MobilePress Register, Inc. v. Faulkner, 372 So.2d 1282 (Ala. 1979); Prudential Insurance Co. of America v. Watts,451 So.2d 310 (Ala.Civ.App. 1984); Bryan v. Brown,339 So.2d 577 (Ala. 1976), cert. denied, Brown v.Bryan, 431 U.S. 954, 97 S.Ct. 2675, 53 L.Ed.2d 271
(1971). We also advise the Bar to be mindful of Dun Bradstreet when employing Alabama Pattern JuryInstructions: Civil, instruction 23.05-06.