E.L. Clark sued Albertville Nursing Home ("the nursing home") and Audrey Hopper (now Audrey Cole) in the Marshall County Circuit Court, claiming that the nursing home was indebted to him for failure to pay a 5% increase in monthly rental allegedly due under a real estate lease. Clark filed a motion for summary judgment, and the trial court denied that motion.
The trial court heard ore tenus testimony and entered a judgment in favor of the nursing home, stating, in pertinent part, that the court found, as a fact, that the lease agreement was made to conform with the requirements of the Medical Services Administration ("Medicaid") of the Alabama State Department of Public Health. We affirm.
The issues before us are whether the trial court erred in admitting parol evidence and whether Clark is entitled to the accrued 5% increase in rent pursuant to the lease agreement.
In December 1976, Clark entered into a lease agreement for a ten-year term to begin January 1977, with Ms. Cole and the Albertville Nursing Home, Inc., to operate a nursing home from the facility he owned. The lease called for rental payments to Clark at the rate of $75.00 per bed per month and contained a provision for a 5% increase in rent after five years. Clark and Ms. Cole submitted that lease to Medicaid for its approval. Thereafter, Ms. Cole advised Clark that Medicaid had approved her facility for reimbursement at the rate of only $63.68 per bed. Subsequently, in April 1977, the parties executed a second lease identical to the first lease except for changing the rate of rental payments per bed to the rate approved by Medicaid.
The controversy in this case concerns the "escalator clause" of the second lease, which provided for an automatic increase in rent after five years. Ms. Cole testified that in 1981, following Medicaid's annual regulatory agency audit of her nursing home, she was advised by Medicaid that the 5% increase would not be approved. Thereafter, Ms. Cole continued making rental payments each month for the amount stated in the second lease, without the 5% increase. Clark claims that he made repeated oral requests to Ms. Cole to pay the 5% increase and that each time she agreed to pay. Ms. Cole, however, denied that there was any communication with Clark regarding a demand for a 5% increase, except for the time that she showed him the notice from Medicaid stating that it would not approve the increase. With 11 months remaining on the lease, Clark filed suit, claiming damages representing the 5% monthly increase aggregated over 48 months — a value of $20,326.56. *Page 11 
Clark contends that the trial court erred in allowing parol evidence concerning the lease, because, he says, all prior negotiations and agreements were merged into and became part of the written contract, and because the general rule is that parol evidence of prior negotiations between the parties offered to explain, contradict, vary, or subtract from the written terms of a contract is not admissible. League v.Giffin, 347 So.2d 1332 (Ala. 1977).
Ms. Cole contends that the 5% increase was not enforceable because, she says, prior to its execution, she and Clark orally agreed 1) that the rental payments would be the maximum rent for which they could obtain approval by Medicaid and 2) that they would adjust the rent to conform to that amount. This contention was supported by the testimony of Ms. Cole and that of Charles R. Hare, Jr., the attorney who drew up the lease agreement. The trial court allowed the evidence of this oral agreement over Clark's objection.
The general rule of contract law is that, if a written contract exists, the rights of the parties are controlled by that contract, and parol evidence is not admissible to contradict, vary, add to, or subtract from, its terms,Tyler v. Equitable Life Assur. Soc. of the United States,512 So.2d 55 (Ala. 1987); Gunnells v. Jimmerson, 331 So.2d 247
(Ala. 1976), in the absence of mistake or fraud or ambiguity,League v. Giffin supra; Gunnells v. Jimmerson, supra.
While we agree that no fraud or mistake existed when the parties entered into the lease agreement, we cannot agree that there was no ambiguity. The pertinent provisions of the lease agreement are as follows:
"FIRST
 "At the end of each five year period under the term of this lease or any renewal thereof, said rental shall automatically increase 5% of the original rental amount.
". . . .
"THIRD
 "[Ms. Cole] must, at all times, comply with all state and federal laws and all regulations of any state or federal regulatory agency and shall provide [Clark] with a copy of all inspection reports.
". . . .
"TWENTIETH
 "[Ms. Cole] will provide [Clark] with copies of cost reports and financial statements required by Medical Services Administration and any other state or federal regulatory agency."
The ambiguity in the lease agreement in the instant case arises when paragraphs 1, 3, and 20 are considered together. If read alone, paragraph 1 clearly authorizes a 5% automatic increase in rental payments. However, if integrated with paragraphs 3 and 20, the 5% increase appears to have been subject to the regulations of Medicaid after Medicaid's determination based on required cost reports and financial statements.
Thus an ambiguity existed as to the terms of the lease agreement, and the trial court properly admitted parol evidence to aid in the interpretation of the contract and to show the purpose and character of the transactions. League v. Giffin, supra.
Ms. Cole's testimony, in pertinent part, was as follows:
 "Q. Mrs. Cole, my question was how did you arrive at the figure of $75 a bed?
 "A. This was the amount that Mr. Clark thought that he could get reimbursed for from Medicaid.
". . . .
 "Q. Did you and Mr. Clark consult with [Mr. Hare] prior to the preparation of the first lease in December of 1976?
"A. Yes, sir.
 "Q. Did you discuss, in Mr. Clark's presence, with Mr. Hare that you had agreed to pay — you'd agree to pay Mr. Clark the maximum that Medicaid would approve?
"A. Yes, sir.
". . . . *Page 12 
 "Q. Did you advise Mr. Clark that $63.68 a bed as approved by Medicaid was the maximum that they would approve?
"A. Yes, sir.
 "Q. And at that time did you go back — Did Mr. Hare amend the first lease, the one that called for $75 a bed?
"A. Yes, sir.
". . . .
 "Q. In the second lease there was a provision for a 5% increase?
"A. Yes, sir.
"Q. After 5 years?
"A. Yes, sir.
 "Q. Did you attempt, through Medicaid, to get this 5% increase?
"A. Yes, sir.
"Q. After 5 years?
"A. Yes, sir.
". . . .
 "Q. Well, you entered into [the second lease] and signed that agreement after you had been to Medical Services Administration pertaining to your operating the nursing home and your lease with Mr. Clark, and it was also entered into after you had negotiated with Mr. Clark about what the rent would be?
"A. Yes, sir.
 "THE COURT: Let me ask you a question. Is the court correct in assuming that you have to have a written lease — that you had to have a written lease between you and Mr. Clark in order to get any kind of approval from Medicaid?
"[Ms. Cole]: Medicaid, yes, sir.
"THE COURT: It was a requirement?
 "[Ms. Cole]: It's required through Medicaid — you have to have a lease, yes, sir."
 Mr. Hare's testimony, in pertinent part, was as follows:
 "Q. Did the parties, together, tell you why they wanted the second lease drafted?
"A. Yes, sir.
". . . .
"Q. . . . the reason for the second lease?
 "A. I was told that the Medical Services Administration did not approve the amount we had put in the lease — the first lease — and the parties instructed me to draft the second lease to coincide with the amount that had been approved by Medical Services Administration.
 "THE COURT: Those instructions came from both parties?
"[Mr. Hare]: Yes, sir.
"THE COURT: Were joint instructions?
"[Mr. Hare]: Yes, sir.
". . . .
 "Q. Mr. Hare, did the parties state to you the reason — Did the parties state to you that they wanted Mr. Clark to receive the maximum amount that would be approved by the Medical Services Administration?
"A. Yes, sir.
". . . .
 "Q. Did you suggest to them incorporating this maximum approved rent by Medicaid into the contract?
"A. Yes, sir.
". . . .
 "Q. The question was did both of these parties, in your presence in your office, state what their reason was for not wanting to put the maximum rate?
 "A. Yes, sir. They stated to me that they did not want a stipulation in the lease or an agreement in the lease to maximize the amount approved by Medical Services Administration because they felt like that would reduce the amount that would be approved.
". . . .
 "Q. What did they state to you concerning the executed lease? Was it or was it not to be approved by Medicaid?
 "A. Yes, sir, it was subject to approval of Medicaid."
Under the "ore tenus rule," a presumption of correctness accompanies the trial court's judgment when it has made findings of fact based on oral testimony without a jury, and its judgment will not be reversed unless it is shown to be plainly and palpably wrong, considering all of the *Page 13 
evidence and all inferences that can be logically drawn from the evidence. King v. Travelers Ins. Co., 513 So.2d 1023
(Ala. 1987); McCrary v. Butler, 540 So.2d 736 (Ala. 1989). The trial court's judgment in such a case will be affirmed, if, under any reasonable aspect of the testimony, there is credible evidence to support the judgment. McCrary v. Butler, supra;Jones v. Jones, 470 So.2d 1207 (Ala. 1985).
From our review of the record, we conclude that the trial court's finding that Ms. Cole and Clark entered into a lease agreement that was to conform to the requirements of Medicaid is supported by the evidence and is not plainly and palpably erroneous; therefore, since Medicaid would not agree to the 5% increase in monthly rent for the second five-year period, Clark was not entitled to such an increase.
For the foregoing reasons, we affirm the judgment of the trial court.
AFFIRMED.
HORNSBY, C.J., and JONES, SHORES and KENNEDY, JJ., concur.