THOMAS, Judge.
On October 15, 2012, Richard Salazar, The Heritage Club, Inc. (“the Heritage Club”), and the Private Club, LLC (“the Private Club”) filed a complaint against Augustus Tucker in the Madison Circuit Court. (The Heritage Club, Inc., the Private Club, LLC, and Salazar are hereinafter referred to collectively at times as “the plaintiffs”). Salazar was a shareholder in the Private Club, which, after August 15, 2007, owned, at different times, some or all of the stock of the Heritage Club. The Heritage Club was a private lunch-and-dinner club, and Salazar was employed by the Heritage Club as “the director of food and beverage.” Although it is not entirely clear, it appears that the Private Club was an “investment club,” which had, at different times, between one and three members, including, but not limited to, Salazar, Tucker, and John Esneault.[1]
The complaint asserted claims including tortious interference with contractual and business relationships and defamation. Specifically, the plaintiffs requested a temporary restraining order and a preliminary injunction restraining Tucker, from operating the Heritage Club or communicating to anyone that he controlled the operation of the Heritage Club.[2] The plaintiffs requested a trial, a permanent injunction, an award of all the records regarding the business operations of the Heritage Club, a declaration that the Private Club was the primary owner of the Heritage Club, compensatory and punitive damages, and an award of attorney fees.
Tucker filed an answer, generally denying the plaintiffs’ allegations and asserting various defenses. Tucker filed an amended answer, a motion to dismiss, and a counterclaim. Tucker requested relief, including the removal of the Heritage Club as a plaintiff and a dismissal of the complaint. In his counterclaim, Tucker sought damages for conversion, “tortious interference,” defamation. Tucker requested a temporary restraining order, a trial, a permanent injunction, and an order requiring Salazar to relinquish control of all property belonging to the Heritage Club, including its bank accounts and its documents. Tucker requested an order declaring that the Private Club was not the owner of the Heritage Club, that Salazar had been properly terminated from his employment with the Heritage Club, and that Tucker had authority to act on behalf of the Heritage Club. Tucker requested an award of compensatory and punitive damages and of attorney fees.
A bench trial began on September 30, 2013. On October 2, 2013, without including any specific findings of fact, the circuit court entered a judgment determining that the Private Club was the majority shareholder of the Heritage Club. It awarded Salazar damages in the amount of $50,000 on his defamation claim and $50,000 on his tortious-interference-with-business-rela-tions claim, and it awarded the Private Club damages in the amount of $50,000 on its tortious-interference-with-business-re-lations claim. It entered a judgment in favor of Tucker on the plaintiffs’ remaining claims and in favor of the plaintiffs on Tucker’s counterclaims.
On November 1, 2013, Tucker filed a timely postjudgment motion to which he *378 attached copious exhibits. In his post-judgment motion,- Tucker argued that the proceedings were “inconsistent,” that the trial had been unfair because he was allowed only two hours to present his case although the plaintiffs were permitted “approximately two days,” that the circuit court had failed to consider all available evidence, and that the circuit court had abused its discretion by failing to provide Tucker an adequate opportunity to present his defense. Tucker also argued that the circuit-court judge and the court reporter had evidenced bias. Within Tucker’s bias argument, Tucker generally alleged that the circuit court had erred because it 'had “failed to consider Salazar’s own testimony” regarding his communication of “information regarding his suspension and ultimate termination” from the Heritage Club.
On December 12, 2013, the circuit court entered an order granting the plaintiffs’ motion to strike the exhibits attached to Tucker’s postjudgment motion and denying Tucker’s postjudgment motion. In the order, the circuit court expressly denied bias and explained that it had not limited Tucker from calling witnesses; however, it stated that it had “attempted to limit the extent of Tucker’s testimony on direct examination because of the very extensive amount of cross-examination conducted when he was called by [the plaintiffs] as an adverse witness.” On January 23, 2014, Tucker filed a timely notice of appeal to our supreme court. This case was transferred to this court by the supreme court, pursuant to § 12-2-7(6), Ala.Code 1975.
Tucker seeks our review of whether the circuit court erred by failing to consider all available evidence, by limiting Tucker’s ability to present testimony, by concluding that Tucker was liable to Salazar for defamation, by concluding that Salazar was not liable for defamation, by declaring that the Private Club was the majority owner of the Heritage Club, by concluding that Salazar had not accessed funds without authorization, and by concluding that a 401(k) account had not been established for Tucker. However, we need only address Tucker’s second argument— whether the circuit court erred by determining that.Tucker was liable to Salazar for defamation — because, as noted by the plaintiffs in their appellees’ brief, Tucker has waived his remaining arguments by failing to make legal arguments supported by authority, in contravention of Rule 28(a)(10), Ala. R.App. P., which requires that the parties present in their briefs the legal authorities that support their positions. “If they do not, the arguments are waived.” White Sands Grp., L.L.C. v. PRS II, LLC, 998 So.2d 1042, 1058 (Ala.2008).
Because we address only the defamation issue, we provide facts limited to that issue. On August 15, 2007, 100% ownership (1,000 shares) of the Heritage Club stock was conveyed to the Private Club, and by 2009 the Heritage Club was experiencing financial difficulties. Documents entered into evidence indicated that between May 17, 2010, and January 20, 2012, the Private Club sold 28% (280 shares) of the Heritage Club stock in an attempt to meet the Heritage Club’s financial needs. In September 2011, Tucker owned at least 13% (130 shares) of the Heritage Club stock, Tucker and Salazar began communicating “almost daily,” and Tucker became involved in the financial affairs of the Heritage Club; however, Tucker was never a paid employee of the Heritage Club or of the Private Club. Salazar appointed Tucker as the chief financial officer (“CFO”) of the Heritage Club at a time when the financial condition of the Heritage Club was, according to Salazar, “absolutely terrible”; the Heritage Club was unable to fund the second phase of its reconstruction project, *379 to pay bills, or to meet its payroll. In his capacity as CFO, Tucker attempted to acquire a loan or a liné of credit for the Heritage Club, but, Salazar admitted, the Heritage Club’s applications for credit were denied due to problems with Salazar’s personal credit rating. Salazar said: “Number one, the finances of the club individually were not very good. So for someone to guarantee the loan, which is what was needed, I was not able to do it.”
Much of the disputed testimony in this case centered around Tucker’s attempts to raise funds for the Heritage Club. The resolution of this appeal does not require our analysis of the disputed testimony; however, we note that the plaintiffs’ attorney repeatedly impeached Tucker’s evasive and contradictory trial testimony with his deposition testimony. For example:
“Q. [The plaintiffs’ attorney:] And you would agree with me today as we sit here, that the only shares you own in the Heritage Club [are] 130 shares?
A. [Tucker:] That is incorrect.
“Q. [The plaintiffs’ attorney:] Okay. Let me ask you to turn to Page 137 of your deposition at very top. I asked you the question: ‘Okay, have you ever owned more than 130 shares of stock in the Heritage Club?’ And what was your answer?
“A. [Tucker:] No.
“Q. [The plaintiffs’ attorney:] So are you saying today that you do own more than 130 shares?
“A. [Tucker:] Yes, I do.
“Q. [The plaintiffs’ attorney:] Okay, so did you get some more shares since this deposition in March of this year?
“A. [Tucker:] No. When you asked me this question, you did not put a time frame on the 130 shares.
“Q. [The Plaintiffs’ attorney:] I thought I did because the question again is:
‘Have you ever owned more than 130 shares of stock in the Heritage Club?’ And your answer was, ‘no,’ wasn’t it?
“A. [Tucker:] Then that was incorrect.
“Q. [The plaintiffs’ attorney:] So your statement there was incorrect?
“A. [Tucker:] Yes. I thought you asked like today, you said today.”

Standard of Review

“When evidence is presented ore tenus, the trial court is ‘“unique[ly] positioned] to directly observe the witnesses and to assess their demeanor and credibility.” ’ Ex parte T.V., 971 So.2d 1, 4 (Ala.2007) (quoting Ex parte Fann, 810 So.2d 631, 633 (Ala.2001)). Therefore, a presumption of correctness attaches to a trial court’s factual findings premised on ore tenus evidence. Ex parte J.E., 1 So.3d 1002, 1008 (Ala.2008). When evidence is taken ore tenus and the trial judge makes no express findings of fact, this Court will assume that the trial judge made' those findings necessary to support the judgment. Transamerica Commercial Fin. Corp. v. AmSouth Bank, N.A., 608 So.2d 375, 378 (Ala.1992) (citing Fitzner Pontiac-Buick-Cadillac, Inc. v. Perkins & Assocs., Inc., 578 So.2d 1061 (Ala.1991)). We will not disturb the findings of the trial court unless those findings are ‘clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence.’ Gaston v. Ames, 514 So.2d 877, 878 (Ala.1987) (citing Cougar Mining Co. v. Min eral Land & Mining Consultants, Inc., 392 So.2d 1177 (Ala.1981)). ‘ “The trial court’s judgment [in cases where evidence is presented ore tenus] will be affirmed, if, under any reasonable aspect of the testimony, there is credible evidence to support the judgment.” ’ Transamerica, 608 So.2d at 378 (quoting *380 Clark v. Albertville Nursing Home, Inc., 545 So.2d 9, 13 (Ala.1989), and citing Norman v. Schwartz, 594 So.2d 45 (Ala.1991)); see also Ex parte Perkins, 646 So.2d 46 (Ala.1994).”
Espinoza v. Rudolph, 46 So.3d 403, 412 (Ala.2010).
 Tucker contends that the circuit court erred by concluding that he was liable to Salazar for defamation. Regarding Salazar’s defamation claim, the circuit court’s judgment reads: “Judgment is entered in favor of the Plaintiff, Richard Salazar, and against the Defendant, Augustus Tucker, in the sum of $50,000.00 for Defamation.”
“ ‘To establish a prima facie case of defamation, the plaintiff must show [1] that the defendant was at least negligent, [2] in publishing [3]' a false and defamatory statement to another [4] concerning the plaintiff, [5] which is either actionable without having to prove special harm (actionable per se) or actionable upon allegations and proof of special harm (actionable per quod).’
“Nelson v. Lapeyrouse Grain Corp., 534 So.2d 1085, 1091 (Ala.1988) (citations omitted).”
Delta Health Grp., Inc. v. Stafford, 887 So.2d 887, 895 (Ala.2004)(emphasis added).
The record contains a letter (“the suspension letter”) dated July 13, 2012, which was written by Tucker and addressed to Salazar.. In the suspension letter Tucker informed Salazar that his employment with the Heritage Club was suspended and that Salazar should immediately vacate the Heritage Club’s premises. Salazar said that, upon receipt of the suspension letter, he “communicated” with the Heritage Club’s shareholders and scheduled an emergency meeting. Salazar said: “I did communicate — and I already said this, I communicated to our Board of Governors as well.”[3]
The record contains a letter dated July 18, 2012, which was written by Salazar and addressed to “Heritage Club Shareholders and Board of Governors” in which Salazar “update[d] them on [his] previous communication.” In the July 18, 2012, letter, Salazar asserted that, although he had received the suspension letter, the shareholders had supported him. He wrote that Tucker had failed to reinstate Salazar as a “signer on the checking account” or to return his business computer.
Randall Perry, an attorney who testified on behalf of the plaintiffs, said that Salazar showed the suspension letter to him at a meeting, which was attended by Salazar and his wife, Tucker, and two Heritage Club shareholders. According to Salazar, the conclusion at the meeting was that his purported suspension was “null and void” because Tucker had lacked the authority to suspend Salazar. #
On September 7, 2012, Tucker filed a police report alleging that Salazar had embezzled $146,751.25 from the Heritage Club, and he attached to the police report a number of forgery affidavits alleging that Salazar had made unauthorized transfers of funds from two Heritage Club bank accounts.
Salazar testified that Tucker had informed employees of “four or five banks” and “some of the employees” of the Heritage Club that Salazar was suspected of theft and embezzlement. Salazar said that, because he had been questioned by the police, negative comments about him *381 were being circulated in the community, in his church, and in his son’s school; however, Salazar agreed that the information he had shared regarding the suspension letter had had “far greater reach” than had-Tucker’s communications.
In an electronic-mail message (“the suspension e-mail”) dated September 13, 2012, Tucker advised two Heritage Club shareholders that he had scheduled a meeting on the subjects of “Salazar GM/COO, Status of the [Fraud] Investigation, and [the Heritage Club] Bridge Street Rent.”
The record contains a second letter (“the termination letter”) dated September 14, 2012, written by Tucker in which Tucker informed Salazar that his employment with the Heritage Club had been terminated for four specified reasons and that Salazar was under investigation for “Fraud, Theft of property, and Embezzlement of corporate funds.” That same day, Salazar responded to Tucker with an electronic-mail message asserting, among other things, that Tucker was without authority to terminate Salazar; Salazar sent a letter addressed to “Heritage Club Members” that characterized the actions of “a partner” as a hostile takeover and a theft. Salazar admitted that he communicated with the “general membership” of the Heritage Club and that he told between 500 and 600 people that he was being “pushed out” by a partner.
In an electronic-mail message, dated September 17, 2012, Tucker informed Salazar, two Heritage Club shareholders, and Richard Marsden, an attorney who was included in the “general membership” of the Heritage Club, that Salazar had been removed as director. In that message Tucker also asserted that Salazar was under investigation for theft of Heritage Club property, including the funds in its bank accounts.
After a review of the testimony and the documentary evidence presented to the circuit court, we conclude that Salazar failed to establish a prima facie case of defamation, because Salazar failed to show that Tucker published a false and defamatory statement concerning Salazar to a third person. See Atkins Ford Sales, Inc. v. Royster, 560 So.2d 197, 200 (Ala.1990), citing Nelson v. Lapeyrouse Grain Corp., 534 So.2d 1085 (Ala.1988). “If there is no publication, there is no defamation.” Willis v. Demopolis Nursing Home, Inc., 336 So.2d 1117, 1120 (Ala.1976).
In summary, first, Tucker sent Salazar the suspension letter. The contents of the suspension letter were not published to another person by Tucker. Salazar, and not Tucker, published the alleged defamatory statements contained in the suspension letter to the shareholders and the Board of Governors of the Heritage Club.
Second, Tucker acquired forgery-affidavit forms from First Commercial Bank that he attached to a police report, in which he alleged that Salazar had embezzled funds from the Heritage Club. Salazar contends that the information contained in the forgery affidavits amounted to defamatory communications with persons at First Commercial Bank. We find no support for a conclusion that any employee of First Commercial Bank did anything other than provide blank forgery-affidavit forms upon Tucker’s inquiry regarding certain alleged unauthorized transfers and withdrawals of funds. We have not overlooked Salazar’s testimony that Tucker had informed employees of “four or five banks” and “some of the employees” of the Heritage Club that Salazar was suspected of theft and embezzlement; however, Salazar called no bank or Heritage Club employee to testify to that effect. We conclude that, standing alone, Salazar’s self-serving testimony is not suf- *382 fícient' to demonstrate that anyone, much less specifically Tucker, published defamatory statements to third persons. “[Publication may not be done or established by rumor or report.” Weir v. Brotherhood of R.R. Trainmen, 221 Ala. 494, 497, 129 So. 267, 270 (1929); K-Mart Corp. v. Pendergrass, 494 So.2d 600, 604 (Ala.1986) (explaining that a plaintiffs proof was “legally insufficient” to establish publication when the plaintiff relied solely on the inference that the defendant had communicated the alleged defamation because members of the community had heard the statements). Similar to the plaintiff in Pendergrass, Salazar testified that persons other than the Heritage Club’s corporate managers knew that he was under investigation for theft and fraud; therefore it follows, according to Salazar, that Tucker had informed those persons. However, Salazar, like the plaintiff in Pendergrass, failed to demonstrate publication with legally sufficient evidence indicating that Tucker had published the alleged defamatory statements. See Pendergrass, 494 So.2d at 604.
Third, Tucker sent the suspension e-mail to Salazar and to two Heritage Club shareholders. “Communications among the managerial personnel of a corporation about the company’s business do not constitute a publication, under the rule of McDaniel v. Crescent Motors, Inc., 249 Ala. 330, 31 So.2d 343 (1947).” Dixon v. Economy Co., 477 So.2d 353, 354 (Ala.1985).[4]
Fourth, Tucker mailed the termination letter to Salazar. The contents of the termination letter were not published to another person by Tucker; instead, Salazar published the contents of the termination letter to “500 or 600” Heritage Club members.
Finally, Tucker again informed Heritage Club managerial personnel (Salazar, two shareholders, and Marsden) that Salazar had been removed as director and was being investigated for theft, which, as we have already determined, does not amount to publication. See Dixon supra.
Based on the documentary evidence admitted by the circuit court and on Salazar’s failure to provide evidence demonstrating that anyone, other than Salazar, published the alleged defamatory statements regarding Salazar, we conclude that Salazar failed to prove the required elements of a defamation claim.[5] Thus, the judgment of the circuit court is reversed insofar as it determined that Tucker had defamed Salazar, and we remand the cause for the circuit court to vacate that portion of its judgment. In all other respects, the circuit court’s judgment is affirmed.
*383 AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
THOMPSON, P.J., and MOORE, J., concur in the result, without writings.
DONALDSON, J., concurs- in part and dissents in part, with writing, which PITTMAN, J., joins.

. The plaintiffs’ attorney said: "[The] Private Club, LLC, does nothing but own stock.”

. On October 15, 2012, the circuit court entered a temporary restraining order and restrained Tucker from operating the Heritage Club or from holding himself out as the operator of the Heritage Club. The circuit court required the plaintiffs to post bond of $10,000, which the plaintiffs failed to do. The circuit court dissolved the temporary restraining order on October 25, 2012.

. The record does not disclose the identities of the persons on the Heritage Club’s Board of Governors.

. We note that Tucker was never a paid employee of the Heritage Club, but Salazar testified that he had appointed Tucker to be the CFO of the Heritage Club. Likewise, the two shareholders were never paid managers of the Heritage Club; however, they attended meetings and made decisions regarding the management of the Heritage Club.

. We have not relied upon Tucker's testimony to reach the conclusion that Tucker is not liable for defamation. Because our review of the transcript reveals that Tucker’s testimony was often evasive and contradictory, and because the plaintiffs’ attorney repeatedly impeached Tucker's trial testimony with his deposition testimony, the circuit court could have rightly discounted his testimony.
"In ore tenus proceedings, the trial court is the sole judge of the facts and of the credibility of witnesses, and the trial court should accept only that testimony which it considers to be worthy of belief. Ostrander v. Ostrander, 517 So.2d 3 (Ala.Civ.App.1987). In determining the weight to be accorded to the testimony of any witness, the trial court may consider the demeanor of the witness and the witness’s apparent candor or evasiveness. Ostrander."
Brown v. Brown, 586 So.2d 919, 920-21 (Ala.Civ.App.1991).