THOMPSON, Presiding Judge.
*172 L.S. ("the mother") appeals from a judgment of the Morgan Juvenile Court ("the juvenile court") granting the request of A.S. ("the father") to transfer primary physical custody of I.S., the parties' child ("the child"), from the mother to the father. The juvenile court also found the mother in contempt for five separate acts. The mother was sentenced to serve five days in prison for each act of contempt. However, the juvenile court suspended the mother's sentences, placing her on two years of unsupervised probation for each act with each sentence running consecutively.
This action began less than two weeks after the juvenile court entered a judgment adjudicating the paternity of the father. That judgment was entered on May 16, 2016. On May 25, 2016, the father received a certified letter from the mother informing him of the mother's intent to relocate with the child to Hawaii as of July 2, 2016. On June 15, 2016, the father filed an objection to the mother's proposed move and sought custody of the child. The juvenile court held a hearing on the father's objection on July 5, 2016. At the outset of that hearing, the father's attorney made clear that custody was not at issue at that point because the parties had not even engaged in discovery yet. The hearing was held on the issue of the mother's proposed move, and the father sought visitation with the child at that time.
At the July 5, 2016, hearing, the father testified that, once his paternity had been adjudicated, the mother would not allow him to visit with the child except in public, in her presence. The mother and the father have never been married. When the child was born, the father said, he saw the child every day for the first two weeks. From then on, he said, he was able to see the child when the mother "felt it was appropriate for me to see him." The father was able to exercise unsupervised and overnight visitation with the child before his paternity was adjudicated but not afterward.
The mother, who appeared at the July 5, 2016, hearing pro se, told the juvenile court that she did not intend to move to Hawaii without the express written consent of the court. The mother's letter to the father regarding the move was admitted into evidence at that time. In the letter, the mother stated, "[t]here are several reasons for the move but the main reason is the inconsistent weather in Alabama, support, and health." The mother stated that she had "established an apartment in my previous state of residence located in Hawaii," where, she said, she had lived for four years while serving in the military and where she had graduated from college.
At the July 5, 2016, hearing, the mother testified that she was estranged from her parents. Regarding her support group, the mother said that her "shipmates" in Hawaii "are family to me [more] than anybody here." She also stated that she needed to move to Hawaii because, she said, the child and she both have allergies. She said that Hawaii "would be an awesome place to raise my son." She told the juvenile court that she had been approved for Section 8 government-subsidized housing in Hawaii even though she had not lived there in four years. The mother also told the juvenile court that another reason for her decision to move to Hawaii was that she was "going through counseling" "for a possible rape in the area." She added that she and the child needed a fresh start.
The juvenile court stated that the child and the father had a right to have a relationship and that it had not heard sufficient reason to justify the mother's request to move with the child to Hawaii. The juvenile court also awarded the father *173 graduated visitation with the child, gradually increasing their time together so that the father would have standard visitation by the first weekend in September 2016.
Subsequent to the trial court's decision that the mother could not move to Hawaii with the child, an evidentiary hearing on the issue of custody was held over two days in January and April 2017. During the custody hearing, the father said that, when he had the child for visitation periods, the mother constantly texted him or called him on the telephone to check on the child. She acknowledged that she often called or texted the father when he had the child because, she said, "a mom's job is to know where her kid is and to know that they're okay and that they're surrounded by good people." She said that, on one occasion, the father went "approximately two hours" without letting her know of the child's location and that, on that occasion, she had the police check on the child. The mother also said that the child and the father had spent the night at another woman's house and that the child was not familiar with that woman. She conceded that she "went to the cops" on that occasion, as well. The mother also admitted to another instance when she drove past the father's mobile home when the father had the child for visitation. She said that she drove to the father's mobile home and texted the father, asking if she could see the child. When the father would not show her the child, she said, she "took a picture of the trailer to know where my son was and drove off." Furthermore, the mother acknowledged that she notified the Department of Human Resources ("DHR") regarding safety concerns she had regarding the father while the child was in his care. The mother said that she did not formally file charges against the father with DHR.
The mother testified that she has an associate's degree in finance and business management, a bachelor's degree in business management, a master's degree in business management, and had begun work on a doctoral degree in accounting but was not pursuing that degree at the time of the hearing. She characterized the father as a "deadbeat" because, she said, he went five months without paying her child support. She said that she was not sure whether that was before or after his paternity was established. Evidence was presented indicating that, before the adjudication of paternity, the mother intimated to the father that the child was not his and suggested other possibilities as to who the father might have been. The father explained that his daughter, who was not much older than the child, and he were attached to the child, and so, when the mother intimated that he might not be the father of the child, he began to withdraw, in case another man was found to be the child's father. (A DNA test conducted before the adjudication of paternity indicated that the father was, in all likelihood, the child's father.) Regardless, the evidence is undisputed that, by the last day of the custody hearing, the father's child-support payments were current.
The mother said that she has asked the father to "sign his rights over" to her because of the lapse in support payments and because, she said, "I just don't think he's a good role model." She said that she thought of the father as a "deadbeat" because, she said, he had had multiple arrests for driving under the influence ("DUI") of alcohol and because, she said, he had allowed the child to be scratched by a cat 27 times in one incident.
Photographs of the child's foot and lower leg showing the cat scratches were admitted into evidence. The photographs depict scratches; they do not indicate bite *174 marks or anything extraordinary. The father told the mother that the cat, a tabby who was 11 months old in April 2017, scratched the child when the child stepped on its tail. The father said that he had warned the child several times not to step on the cat before the incident. After the incident, the father said, the child no longer tried to step on the cat. He also said that the child was in the living room when the incident occurred, and that he was in the kitchen, but that he was able to observe the child from the kitchen. The mother accused the father of allowing the child to be near a "wild" cat unsupervised.
The father acknowledged that he had had at least one DUI resulting in a suspended driver's license. By the last day of the hearing, the father said, his license had been reinstated. However, he said, he was still on probation and still had fines to pay. In the July 2016 order granting the father visitation with the child, the juvenile court had ordered that the father could not drive the child until he had obtained a valid driver's license. The order also listed the names of three individuals whom the mother found acceptable to transport the child to and from custody exchanges. If one of those people were not available to drive, the order stated, the father was to notify the mother of who would be transporting the child. The mother testified that, on one occasion, the father sent her a message saying that none of the people listed in the order as possible drivers was available, so she denied him visitation, explaining that the father did not tell her who would be driving.
The father testified that the father of one of the people on the list had died and so two of the people on the list were unable to drive him to make that weekend's custody exchange. He said that he explained the situation to the mother, who, he said, told him: "I won't be bringing [the child] to your today." When the father asked the mother what he could do to rectify the situation, the mother replied by a text message, stating: "We are past that point. I am very busy. Thank you." The father said that he went to the designated location where the exchange was to take place but that the mother and child did not appear.
The father said that, on another occasion, the mother was two and a half or three hours late for the first custody exchange. The father said that he asked the mother if he could make up the time and that the mother refused. The mother testified that she had asked the child "a few times" if he would like to call the father on the telephone. However, she said, she does not call the father so that the child can talk with him. The mother said she was "so busy taking care of" the child that she was "not going out of my way to call his dad so that he can check on him." The mother also insisted that it was not her job to call the father during the times she had the child to provide him with updates on how the child was doing. She reiterated that her job was to take care of the child and to know where the child was at all times, even during the father's visitation periods. She admitted that the father allows the child to call her during the father's visitation periods. The mother further testified that, when the child is in her custody, the child and she "are always in the same room."
The father testified that he had worked with the child on learning to count to ten and learning his numbers. The father explained that the child could count to three without any prompts but that he coached the child to reach ten. The mother said that the child learned to count with her by playing tag. The father said that he was also working to potty-train the child, who was three years old at the time of the *175 hearing. He said that he made some suggestions to the mother but that she said she did not need his help. Instead, the father said, the mother bought the child a guitar and asked the father to teach him to play. The father told the mother that they should first "work on the simple things" like potty-training, counting to ten, and learning to identify colors, before trying to play guitar. He said that the mother became upset and said she would just pay for lessons for the child herself.
The father also testified that, when the child is with him, he plays outside with other children and also plays with the father's two other children and other family members. Photographs admitted into evidence depict the child playing with other children indoors and outdoors, playing with family members, and opening birthday and Christmas presents at the father's house. One photograph shows the child and the cat sitting on the couch together. The child appears happy. The father testified that the photograph was taken after the incident when the child stepped on the cat's tail. In the photographs, the father's house appears to be well kept.
The mother testified that the father lived in "filth" but then said that she had never been in his home. She said that the child was dirty and had cat scratches and bug bites when he was returned to her. She added that she considered that "filth." The mother denied that the child had ever experienced a bug bite or a mosquito bite while in her care. The mother conceded that the child had to be transported to the hospital by ambulance and required stitches while in her care when he pulled a mirror "out on him." The mother claimed that the father was "unsafe" because he had told her he had "bribed" the child with candy to put on a hat for a Christmas photograph. The mother accused the father of spending money on "stupid" stuff rather than on child support. She also said that it was "unsafe" for the father "to be around children if he's going to bribe" them with candy.
The mother further testified that she tells the child that his stepbrother ("the stepbrother"), the father's oldest child, is not his real brother. The father testified that the child refers to the stepbrother as "Bubba" and that the mother has demanded that the father quit making the child call him "Bubba" because, he said, the mother said that "he's not his Bubba." The father's middle child, who is close in age to the child, calls the stepbrother "Bubba," as does almost everyone else, the father said.
Jennifer Hammock, who was once a mutual friend of the mother's and the father's until she had a falling out with the mother, testified that the mother's behavior "can be very erratic and it changes from mood to mood, and she brings her child in that mood with her. [The father] thinks more of what is going to be in the best interest of his children and not necessarily what is in his [ (the father's) ] best interest." Hammock said that, in her opinion, the father was the more stable person and, therefore, would be the better parent.
The mother objected to the father's allowing Hammock to see the child. The mother said that she stopped allowing Hammock to babysit for the child when she learned that Hammock had not told her the father was going to be present on a day trip to the river the child and Hammock made. The evidence was undisputed that the child was where Hammock had told the mother he would be. The juvenile court orally denied the mother's request to prohibit the father from allowing the child to see Hammock.
At the last day of the custody hearing, Hammock testified to an incident involving a custody exchange after the father's 2017 Easter visitation, about ten days before *176 the final day of the hearing. Hammock said that, over the weekend, the father had contacted her about taking the child to the exchange on Monday morning because the father had to be at work early. Hammock said that it was her understanding that the mother was aware of the arrangement and knew which vehicle Hammock would be driving. When she arrived at the location where the exchange took place, Hammock said, the mother started taking photographs of Hammock's license plate while Hammock was still putting the vehicle in "park." The mother was visibly upset, shaking, and acting "erratic," Hammock said.
Hammock testified that, as she was exiting the vehicle and attempting to help the child out of the vehicle, the mother met her at the door and began questioning her about how long she had had the child and what time the father had dropped off the child at her house that morning. Once she had handed the child to the mother, Hammock said, the mother asked her whether any of her children had graduated high school. Hammock testified that the mother told her that Hammock and Hammock's husband were "sick people." The mother also told Hammock that she "didn't approve of this," apparently referring to the way the exchange of custody was conducted. Hammock said that the mother did not acknowledge the child at all.
The mother testified that she was not told that Hammock was going to bring the child to the custody exchange until the morning of the exchange and that she "was unaware of [the child's] location from 6:00 [a.m.] to 8:00 [a.m. or that the child] was anywhere outside of where he was supposed to go." When the father told the mother Hammock would be bringing the child to her that morning, the mother's response was "no." The mother said that, when he is in her custody, the child is "pretty much always with me." At the time of the trial, the mother said that she worked at the child's day care.
The mother denied that she had said negative things about the father in front of the child at custody exchanges. She said, however, that when the child said he did not want to go with the father, she tells the child she is "sorry, we're just going to have to pray about it, you've got to go and it will work out." The father said that, at one exchange, the child arrived and was in a "happy-go-lucky" mood. As the exchange occurred, the father said, the mother said to the child: "I know you don't want to go. Mommy is going to fix this." The father testified that the mother did nothing to foster or encourage a good relationship between the child and him. He said that she does not provide information about the child when requested, including medical-insurance information, doctor's names, and other medical information, telling the father he can find the information from other sources, such as pill bottles. The father also said that the mother does not work with him to co-parent the child.
When the father's attorney questioned the mother, her answers were often erratic, nonresponsive, or argumentative. She had facile excuses for not providing the father with medical information about the child or for not allowing the father to have contact with the child. For example, when the father asked the mother whether he could go to the YMCA to see the child during swimming lessons, the mother said that was "something that me and [the child] are doing together, and I don't want to be seen in a bathing suit in front of him doing something that close with my son."
At the custody hearing, the mother also testified that, other than volunteering at the child's day care, she did not have a job until she obtained employment at the day care shortly before the end of the trial.
*177 However, she said, she had applied to go back to work at a hotel and to "go back to selling cell phones." She said that, while she was in the military, she had been a firefighter aboard ship. Early in her testimony, the mother said that the last time she was employed was the summer before the January 2017 hearing, when she earned minimum wage cleaning at a hotel. Once she was awarded disability, the mother said, she quit that job. The mother said that she was able to work, however.
The mother said that she had income of approximately $1,100 a month from disability payments she received for a "bad back," a "bad shoulder," and for what she said was a "chemical imbalance." She explained that the "imbalance" caused "depression with psychosis" for which she took two types of medication. The mother could not or would not specify the psychosis.
At the time of the custody hearing, the father, who works in metal fabrication, lived in a mobile home in an eight-unit mobile-home park in Priceville. The father described its location to the juvenile-court judge, who said he was familiar with it. The mother had moved from Decatur to an apartment in Huntsville. She said that, after the child was born, she lived for two years in a three-bedroom house that belonged to her family. She said that, when her father took her stepmother and her stepsister's children on vacation without inviting the child, she "got mad and we moved" into a one-bedroom apartment in Decatur. The mother said that she had obtained public assistance to live in the apartment, and she had paid no rent. She moved to the Huntsville apartment, which has two bedrooms, about six months before the start of the custody hearing, saying that, after her grandparents died, she "needed to just move out of Decatur" because, she said, everything reminded her of them. She acknowledged that the Huntsville apartment was farther from the father's house. She also said that the Huntsville apartment is not public housing and that she now pays rent of approximately $680 per month.
On August 9, 2017, the juvenile court entered a judgment that did not include specific factual findings on the matter of custody but determined that the father had met his burden under Ex Parte McLendon, 455 So.2d 863 (Ala. 1984). The juvenile court awarded the parties joint legal custody of the child and awarded the father sole physical custody of the child, subject to the mother's standard visitation and any additional visitation to which the parties could agree.
The juvenile court also found that the mother had committed five separate acts of contempt and sentenced her to five days in jail for each of the five acts. However, the sentences were suspended and the mother was placed on unsupervised probation for each act, "with each sentence running consecutively."
The mother obtained an attorney, who filed a timely motion to alter, amend, or vacate the judgment on August 23, 2017. On August 29, 2017, the juvenile court denied the mother's postjudgment motion. The mother then filed a timely appeal to this court on September 1, 2017. The father did not favor this court with a brief on appeal.
On appeal, the mother contends that the juvenile court abused its discretion in failing to grant her a continuance of the hearing on the father's objection to her proposed move to Hawaii. The record shows that, at the outset of the July 5, 2016, hearing on the mother's proposed relocation, the juvenile-court judge noted that the mother was appearing pro se, and she replied that she had met with an attorney who had advised her to request a continuance.
*178 The juvenile-court judge stated that he had heard his judicial assistant on the telephone with the mother and explained, "It's not appropriate for me to talk with you, but I advised [my judicial assistant] to tell you no because of the emergency nature of this." The juvenile court noted that the mother had advised the father that the proposed move was imminent.
In her brief on appeal, the mother contends that the juvenile court also heard evidence regarding the issue of the father's visitation at the July 5, 2016, hearing and that the mother had had no notice that the matter of visitation would be addressed. Therefore, she claims, she was not afforded due process at that hearing and the resulting order of July 7, 2015, which denied her request to move and instituted a graduated visitation schedule for the father, was void.
After the July 7, 2016, pendente lite order was entered, the juvenile court held a hearing on the issue of custody and took two more days' worth of testimony. It is undisputed that the mother had notice that the issues of visitation and custody were to be considered during that hearing. The juvenile court then entered a final judgment awarding the father sole physical custody of the child subject to the mother's visitation. That judgment effectively replaced the July 7, 2016, order. See, e.g., Morgan v. Morgan, 183 So.3d 945, 966 (Ala. Civ. App. 2014) ("A pendente lite order is replaced by the entry of a final judgment."). The proper method of seeking appellate review of a pendente lite order "'is by way of mandamus.'" Id. (quoting Sizemore v. Sizemore, 423 So.2d 239, 241 (Ala. Civ. App. 1982) ).
" ' " 'The general rule is, if pending an appeal, an event occurs which renders it impossible for the appellate court to grant any relief, the appeal may be dismissed. There are many instances in which such condition may arise.... The condition may ... arise from the act of the court a quo, that is to say, from some order or judgment in the case pending the appeal, which is made by the court, which renders the determination of the questions presented by the appeal unnecessary. Paris Electric Light [& Ry.] Co. v. Martin (Tex. Civ. App. [1895] ) 31 S.W. 243 ; 2 Cent. Dig. Appeal and Error, § 71 et seq.' "
" ' Siegelman v. Alabama Ass'n of Sch. Bds., 819 So.2d 568, 575-76 (Ala. 2001) (quoting Caldwell v. Loveless, 17 Ala. App. 381, 382, 85 So. 307, 307-08 (1920) ) (emphasis added in Siegelman ).'
" Medical Assurance Co. v. Anesthesiology & Pain Med. of Montgomery, P.C., 957 So.2d 459, 463 (Ala. 2006)."
Lang v. Lang, 61 So.3d 311, 316-17 (Ala. Civ. App. 2010).
In this case, the intervening hearing on the issue of a custody modification and the judgment replacing the July 7, 2016, order renders moot any issue regarding the propriety of the July 7, 2016, order. Accordingly, this court will not consider whether the juvenile court erred in entering that order. See Auburn Med. Ctr., Inc. v. East Alabama Health Care Auth., 908 So.2d 243, 245-46 (Ala. Civ. App. 2003) (holding that a court will not decide a legal issue that is irrelevant to the outcome of case); Lang, 61 So.3d at 317.
In her appellate brief, the mother also contends that the father failed to meet his burden under McLendon, supra, "by a preponderance of the evidence." Our standard of review in a case involving a request for a custody modification, in which the evidence is presented ore tenus, is well settled.
*179 "When evidence is presented ore tenus, the trial court is ' "unique[ly] position[ed] to directly observe the witnesses and to assess their demeanor and credibility." ' Ex parte T.V., 971 So.2d 1, 4 (Ala. 2007) (quoting Ex parte Fann, 810 So.2d 631, 633 (Ala. 2001) ). Therefore, a presumption of correctness attaches to a trial court's factual findings premised on ore tenus evidence. Ex parte J.E., 1 So.3d 1002, 1008 (Ala. 2008). When evidence is taken ore tenus and the trial judge makes no express findings of fact, this Court will assume that the trial judge made those findings necessary to support the judgment. Transamerica Commercial Fin. Corp. v. AmSouth Bank, N.A., 608 So.2d 375, 378 (Ala. 1992) (citing Fitzner Pontiac-Buick-Cadillac, Inc. v. Perkins & Assocs., Inc., 578 So.2d 1061 (Ala. 1991) ). We will not disturb the findings of the trial court unless those findings are 'clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence.' Gaston v. Ames, 514 So.2d 877, 878 (Ala. 1987) (citing Cougar Mining Co. v. Mineral Land & Mining Consultants, Inc., 392 So.2d 1177 (Ala. 1981) ). ' "The trial court's judgment [in cases where evidence is presented ore tenus] will be affirmed, if, under any reasonable aspect of the testimony, there is credible evidence to support the judgment." ' Transamerica, 608 So.2d at 378 (quoting Clark v. Albertville Nursing Home, Inc., 545 So.2d 9, 13 (Ala. 1989), and citing Norman v. Schwartz, 594 So.2d 45 (Ala. 1991) ); see also Ex parte Perkins, 646 So.2d 46 (Ala. 1994).
" 'However, the ore tenus standard of review has no application to a trial court's conclusions of law or its application of law to the facts; a trial court's ruling on a question of law carries no presumption of correctness on appeal.' Ex parte J.E., 1 So.3d at 1008 (citing Perkins, 646 So.2d at 47, and Eubanks v. Hale, 752 So.2d 1113, 1144-45 (Ala. 1999) ). This Court ' "review[s] the trial court's conclusions of law and its application of law to the facts under the de novo standard of review." ' Id. (quoting Washington v. State, 922 So.2d 145, 158 (Ala. Crim. App. 2005) )."
Espinoza v. Rudolph, 46 So.3d 403, 412 (Ala. 2010).
"The judgment of a trial court based on ore tenus evidence is entitled to a presumption of correctness on appeal. Hermsmeier v. McCoy, 591 So.2d 508 (Ala. Civ. App. 1991). However, that presumption can be overcome when there is an absence of material evidence to support the trial court's factual findings. Means v. Means, 512 So.2d 1386 (Ala. Civ. App. 1987). Thus, while issues concerning child custody are within the sound discretion of the trial court, that judgment will be reversed if it is so unsupported by the evidence that it is plainly and palpably wrong. Hermsmeier, supra, at 509 ; Glover v. Singleton, 598 So.2d 995 (Ala. Civ. App. 1992).
"A parent seeking to modify a previous custody order bears a heavy burden of proof. The parent must prove that a material change in circumstances has occurred since the prior judgment, and that a change of custody will materially promote the child's best interest and that the benefits of the change will more than offset the inherently disruptive effect caused by uprooting the child. Ex parte McLendon, 455 So.2d 863, 866 (Ala. 1984). The evidence must be so substantial as to show an obvious and overwhelming necessity for a change. Klapal v. Brannon, 610 So.2d 1167 (Ala. Civ. App. 1992)."
Vick v. Vick, 688 So.2d 852, 855 (Ala. Civ. App. 1997).
*180 We cannot discern from the record whether a previous custody order was ever entered in this case. If neither parent had previously been awarded sole physical custody, then "the best interests of the child" standard would apply. Ex parte Couch, 521 So.2d 987, 989 (Ala. 1988). However, it appears that, from the time the father's paternity was adjudicated-only nine days before he received the mother's letter notifying him of her intent to move with the child to Hawaii-until the father filed his objection to the proposed move and sought custody of the child, the parties operated under the assumption that the mother had sole physical custody of the child. The paternity judgment does not appear in the record on appeal. In making her argument as to this issue, the mother states that "it is unclear what, if any, material change had occurred since the previous child support order of June 15, 2016."[1] In modifying custody, the juvenile court found that a change of custody "would materially promote the child's best interests and that such a change in custody would more than offset the inherently disruptive effect caused by uprooting the child." See McLendon, supra.
Even if the best-interests standard should have been applied in this case, we would not hold the juvenile court in error for applying the incorrect standard. Typically this court finds that the application of a more stringent standard does not amount to reversible error. See Rehfeld v. Roth, 885 So.2d 791, 794-95 (Ala. Civ. App. 2004) (stating that any error in applying the Ex parte McLendon, 455 So.2d 863 (Ala. 1984), standard to a custody-modification petition was harmless error because the trial court's determination that the petitioner had satisfied the McLendon standard necessarily meant that the petitioner had met the less stringent best-interests standard); and I.M. v. J.P.F., 668 So.2d 843, 845 (Ala. Civ. App. 1995) (noting that "the trial court applied the McLendon standard ... rather than the 'best interest' standard, but because the McLendon standard is more stringent, the trial court's error in that regard is harmless").
As noted, the mother contends that the father failed to demonstrate that a material change in circumstances had occurred since the entry of the child-support judgment. For purposes of this opinion only, we will assume that the child-support judgment constituted an implicit determination that the mother was awarded sole physical custody of the child. The same day the child-support judgment was entered, the father filed his objection to the mother's proposed move and his petition seeking custody of the child. Before that date, there had been no evidence presented regarding the parties' circumstances or which, if either, of the parties should have sole legal and/or physical custody of the child.
We have set forth an extensive rendition of the evidence presented. The evidence, including the mother's own testimony, depicts the mother as having what can be characterized as an extreme attachment to the child that could easily be interpreted as unhealthy for the child. She claimed that she and the child are "always in the same room" when the child is in her custody. Even when the child was at day care, the mother was present, either as a volunteer or as an employee of the day care center. The juvenile court could have concluded from the evidence that the mother allowed her attachment to the child to obscure her judgment on important issues *181 such as housing. For example, because the child was not invited on a vacation that the mother's father took with his stepdaughter's children, the mother became angry and moved from a three-bedroom house owned by her father into a one-bedroom subsidized apartment.
From the evidence, the juvenile court reasonably could have found that, once the father's paternity was established, the mother began taking steps to isolate the child from the father. She initially sought to move with the child to Hawaii, even though she had no family ties and no job awaiting her there. She encouraged the father to give up his parental rights to the child. She did not want the father to participate in things she did with the child, such as attending the child's swim classes. The evidence indicates that the mother found ways to avoid visitation rather than to foster a good relationship between the father and the child. Based on the evidence, the juvenile court could have determined that, instead, the mother appeared to do what she could to hinder that relationship.
To that end, the juvenile court could have found from the evidence that the mother attempted to exert extreme control over the child when he was visiting with the father, demanding to know where the child was at all times, and who he was with, and contending that the father should not expose the child to anyone with whom the child was not familiar. She also attempted to dictate what the child could call his stepbrother and the manner in which he should play while at the father's house.
The record also indicates that the father had a full-time job and said that he was able to financially support the child. He also had stable housing. The mother presented no evidence to refute that testimony. At the outset of the custody hearing, the mother relied on monthly disability income of approximately $1,100, even though, she said, she was able to work. Despite having earned numerous degrees in business or finance, the mother chose to do volunteer work or work at the child's day care.
The juvenile court had the opportunity to observe the parties as they testified and otherwise appeared in the courtroom during the relocation hearing and the custody hearing. The mother's testimony often consisted of hyperbole, tending to cast doubt on the credibility of her testimony. For example, she called the father's 11-month-old tabby cat, a photograph of which was included in the record, a "wild" cat. Based on the testimony and the photographs presented, the juvenile court could have believed that the mother's concern over the incident in which the cat scratched the child was disproportionate to the actual cause and harm of that incident. The juvenile court's duty was to observe and to assess the witnesses' demeanor and credibility. Ex parte T.V., 971 So.2d 1, 4 (Ala. 2007). The comments the juvenile-court judge made during the trial to the effect that it was his duty to determine whether a party was being truthful indicate that he exercised his duty thoughtfully and diligently. In short, after considering the evidence in its entirety, we cannot say that the evidence is insufficient to support the juvenile court's judgment and that its determination that modifying custody would promote the child's best interests and would more than offset the inherently disruptive effect of such a modification was plainly and palpably wrong.
The mother also contends that the juvenile court erred in finding her in contempt because, she says, it failed to inform her of her right to counsel before making such a finding. She also asserts that she did not knowingly, intelligently, or voluntarily *182 waive her right to counsel before being found in contempt.
In her appellate brief, the mother states that, "[b]ecause a loss of liberty is at stake (incarceration), the contemnor is entitled to counsel and must be informed of such under the Sixth Amendment to the United States Constitution." To support her contention, she also quotes the following language from Rule 70A(c)(3), Ala. R. Civ. P.:[2]
"[U]pon the request of the alleged contemnor and proof of indigence, counsel shall be appointed to represent the alleged contemnor. This right to appointed counsel, once asserted, may be subsequently waived by the alleged contemnor in writing or on the record, after the court has ascertained that the alleged contemnor knowingly, intelligently, and voluntarily desires to forgo the right to counsel. The court may, in its discretion, appoint advisory counsel to advise the alleged contemnor."
The mother cites no additional authority in support of her argument.
We first note that our supreme court has held that contempt proceedings are not criminal cases within the meaning of the United States Constitution or the Alabama Code, Ex parte Evett, 264 Ala. 675, 679, 89 So.2d 88, 90-91 (1956), and our research has revealed no authority for the proposition that the mother must be apprised of her right to counsel before a contempt proceeding can be held, as the mother suggests. The mother has cited no relevant caselaw to support her position. Furthermore, the record indicates that the mother had been served with the contempt petition. Before she testified on the first day of the custody and contempt hearing, the juvenile-court judge reminded her that a contempt petition was pending and that she had a right to obtain an attorney after her attorney withdrew. At the end of the first day of the custody and contempt hearing, held in January 2017, the juvenile-court judge stated that the parties had not yet addressed the matter of contempt and again reminded the mother that she could obtain counsel. The next hearing date was not until April 2017, and the mother did not retain an attorney. There is no evidence in the record indicating that the mother ever requested an attorney, nor did she ever claim that she was indigent and could not afford an attorney. Because the mother never asserted her right to counsel as provided in Rule 70A(c)(3) and never offered proof of indigence, we decline to hold the juvenile court in error for proceeding with the issue of contempt.
Finally, the mother contends that the juvenile court erred as a matter of law in imposing five consecutive two-year probationary sentences. She also claims that the juvenile court found only four acts of contempt, not five, as the judgment stated. As to the contempt issue, the juvenile court's judgment says:
"The Court finds that the [mother] has committed several acts of contempt, including denying the [father] visitation with the minor child, unilaterally changing the duration of visitation with the minor child, harassing the [father] during his visitation with the minor child, including showing up at the [father's] residence and showing up at other locations where the [father] has been with the minor child, and sending numerous harassing text messages to the [father] after he has exercised visitation. The *183 Court finds that the [mother] has committed five (5) separate acts of contempt, as stated, and sentences the [mother] to five (5) days for each act, totaling twenty-five (25) days. This Court suspends that sentence and places the [mother] on unsupervised probation for two (2) years for each count, with each sentence running consecutively. If this Court finds that the [mother] commits any further acts of contempt, including harassing the [father], withholding the child, or any other violations of this Order, then this Court may, upon proper filing by the [father], revoke the [mother's] probation and order her to serve the entire sentence, day for day."
Although the juvenile court found the mother in contempt for four categories of conduct, it clearly found that the mother had committed at least five separate acts constituting contempt. For example, the judgment states that the acts of contempt included harassment by "showing up at the [father's] residence and showing up at other locations where the [father] has been with the minor child, and sending numerous harassing text messages to the [father] after he has exercised visitation." Thus, the juvenile court could have found that the mother engaged in harassment on at least two occasions by "showing up" at locations where the father had taken the child during his visitation period and perhaps on numerous occasions by sending harassing text messages. The evidence supports the juvenile court's determination that the mother engaged in at least five separate acts of conduct constituting contempt.
The mother asserts that the juvenile court illegally imposed five two-year probationary sentences to run consecutively for an aggregate of ten years' probation. Rule 70A(e)(1), Ala. R. Civ. P., which governs the punishment for criminal contempt,[3] provides that "[t]he court may not punish a person for criminal contempt under the provisions of this rule by imprisonment or a fine exceeding the maximum term of imprisonment or maximum amount of fine provided by law." See also § 12-1-10, Ala. Code 1975 ("The courts of this state may punish contempt as provided by law.").
"[U]nder the Alabama Criminal Code, [criminal] contempt is only an 'offense,' § 13A-1-2(1), [Ala. Code 1975,] not a 'crime,' § 13A-1-2(5)[, Ala. Code 1975 ]. The maximum sentence the circuit court can impose for criminal contempt is 5 days in jail and a $100 fine. Ala. Code 1975, § 12-11-30(5). An offense that may be punished only for 30 or fewer days in jail is a 'violation,' § 13A-1-2(2). Only misdemeanors and felonies (not violations) are crimes. § 13A-1-2(5). Therefore, under our statutes, criminal contempt is a violation, and is merely an offense, not a crime."
*184 Ex parte Ivey, 698 So.2d 187, 188 (Ala. 1997).
Under Alabama law, the probationary period for a sentence imposed upon a defendant's conviction of a misdemeanor cannot exceed two years, and the probationary period for a sentence imposed upon a defendant's conviction of a felony cannot exceed five years. § 15-22-54(a), Ala. Code 1975. Our research has revealed no authority for the imposition of a probationary period for the offense of criminal contempt or any other violation or offense. Accordingly, we conclude that the juvenile court exceeded its authority in imposing a two-year probationary period for each act of criminal contempt that it found the mother had committed.
Our holding is not to be understood as a prohibition against the suspension of sentences in actions of criminal contempt. We merely conclude that a period of probation cannot be imposed as part of such a sentence.
For the reasons set forth above, we reverse that portion of the juvenile court's judgment imposing probation as part of the mother's sentences for criminal contempt, and we remand the cause for the juvenile court to enter the sentences for contempt in a manner consistent with this opinion. The remainder of the judgment is affirmed.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
Pittman and Moore, JJ., concur.
Thomas and Donaldson, JJ., concur in the result, without writings.

We note that the juvenile court's case number for this matter is CS-16-900051.01. Case number CS-16-900051.00 was styled "State of Alabama ex rel. L.S. v. A.S." In that case, the father was ordered to pay child support of $403 each month as of June 1, 2016.

The mother actually cited "Rule 70A(e)(3) ; however, Rule 70A does not contain a subsection (e)(3).

This court addressed the difference between civil contempt and criminal contempt in Davenport v. Hood, 814 So.2d 268, 272-73 (Ala. Civ. App. 2000) (quoting Hill v. Hill, 637 So.2d 1368, 1370 (Ala. Civ. App. 1994) ):
" 'The question of whether [an action involves] civil contempt or criminal contempt becomes important ... because a contemnor must be in a position to purge himself from the contempt. Mims v. Mims, 472 So.2d 1063 (Ala. Civ. App. 1985). In order to purge himself in a criminal contempt case, the contemnor must pay the fine imposed, serve the authorized time, or do both. Kalupa v. Kalupa, 527 So.2d 1313 (Ala. Civ. App. 1988). In order to purge himself in a civil contempt case, the contemnor must comply with the court's order. Rule 33.4(b), A[la]. R. Crim. P.' "
Because the mother faces a five-day period of incarceration for each act of contempt the juvenile court found, this action involves criminal contempt.